Filed 2/21/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C075573 |
| Plaintiff and Respondent, | (Super. Ct. No. SF114327A) |
| v. | |
| PERCY LAMONTE CAMEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, George J. Abdallah, Jr., Judge. Affirmed as modified.

Mark Farbman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

--------

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through VII.

1

Defendant Percy Lamonte Camel killed two men in separate criminal incidents. Convicted of two counts of first degree murder and other crimes and sentenced to two consecutive indeterminate terms of life without the possibility of parole and other terms, he appeals.

Defendant contends that the trial court erred by determining (1) he did not have standing to challenge a search of the trunk of a car parked on the front lawn of his residence and (2) his trial attorney violated his right to effective assistance of counsel by not proffering evidence of standing to the trial court in connection with the motion to suppress. Even assuming for the sake of argument that defendant had standing to challenge the search of the trunk of the car parked on his front lawn, the court's standing determination did not cause prejudice because the car's trunk was searched under authority of a search warrant. Defendant's ineffective assistance of counsel argument is without merit for the same reason—absence of prejudice.

Defendant also contends that the trial court erred by denying his motion to suppress evidence obtained by wiretap. Specifically, defendant asserts: (1) the court employed the wrong probable-cause test, (2) the court improperly sealed documents attached to the wiretap request, and (3) there was no probable cause supporting the wiretap authorization. We conclude: (1) the court employed the correct probable-cause test, (2) the court properly sealed the documents attached to the wiretap request, and (3) there was probable cause to support the wiretap authorization.

In the unpublished part of this opinion, we address defendant's remaining contentions on appeal and find that some of them require modification of the judgment. We therefore modify the judgment and affirm it as modified.

BACKGROUND

Defendant committed the crimes mainly in two separate incidents: the Skyline incident in December 2009, and the USA Gas incident in February 2010.

2

*Skyline Incident*

On December 1, 2009, Roberto Hernandez drove his car, with his friends Alejandro Salazar and Jorge Sanchez as passengers, toward Red Sea Market in Stockton. On the way, they saw defendant in his distinctive purple Oldsmobile (also referred to in the record at times as a purple Buick), driving methodically up and down streets in the neighborhood. Hernandez and his friends believed defendant was looking for them and, desiring to avoid a confrontation with defendant, Hernandez and his friends drove to Sheba Liquors instead. When they arrived, however, defendant was already there in the parking lot.

Still in his Oldsmobile, defendant leaned out of the driver's window and yelled, "I'm going to kill you all." Hernandez drove out of the parking lot. While Hernandez drove, Sanchez fired a shot. Salazar did not know Sanchez was armed and was upset with him for firing. Salazar had known defendant for years. They played baseball and socialized together when they were younger, but their relationship had become confrontational, with defendant accusing Salazar of disrespecting him.

In the afternoon of the same day, possibly about 30 minutes after the confrontation at Sheba Liquors, Hernandez dropped off his car at his home and went with Salazar, Sanchez, and other friends to Skyline Drive to drink sodas and smoke marijuana, while hiding from defendant. As Hernandez and Salazar were standing on the sidewalk, more than nine shots were fired in rapid succession from behind bushes on a nearby street corner. The gunman was African-American, in his early twenties, with the same build and complexion as defendant, and he was wearing what appeared to be the same hooded sweatshirt defendant was wearing when Hernandez, Salazar, and Sanchez encountered him at Sheba Liquors. As soon as the shots ceased, a car was heard fleeing the scene at a high rate of speed.

Hernandez was shot in the pelvic and chest areas and bled to death. Salazar was shot in the left leg and left arm, which required surgery on his arm. He was in the hospital for two or three weeks.

Thirteen shell casings from rounds shot from a semiautomatic pistol were found where the gunman had been.

Salazar identified defendant as the gunman.

*USA Gas Incident*

During the evening of February 6, 2010, Francisco Bernardino, Raul Abundes, Jr., Vincente Cardenas, and other friends (including Jorge Sanchez, who was present during the Skyline incident) went together from Stockton to the Palladium Nightclub in Modesto. The same evening, defendant went to the Palladium Nightclub with Chris Padilla and others. At the nightclub, Cardenas punched Padilla.

After the nightclub closed, both groups returned to Stockton. Defendant went to his house to get a gun, and drove around with his friends, looking for Cardenas. Bernardino dropped Cardenas off at his home and went to the USA Gas station with Abundes. They eventually parked next to the gas station.

As they sat in the car around 4:00 a.m. on February 7, 2010, and while Abundes was showing Bernardino a photo of his grandfather who had recently passed away, two gunmen fired about 30 shots at them in rapid succession from behind the car. Bernardino was hit more than 15 times and died at the scene. Abundes was hit several times but survived.

Twenty-four casings from a .30-caliber carbine rifle were found closely clustered behind the car, as well as a cluster of eight nine-millimeter casings.

During the morning on the same day as the USA Gas shootings, defendant called Padilla and told him that he shot some friends of Cardenas. Defendant also told Padilla that he had committed the Skyline shooting. A male caller left a voicemail message on

4

Cardenas's cell phone, saying, "Go pick up your boy at the gas station. I think he's dead. Ha ha ha ha."

Cell phone records showed that defendant's cell phone was in the area of both incidents when they occurred. And officers searching defendant's residence found a .30-caliber M1 carbine semiautomatic rifle in the trunk of a green Saturn on the front lawn. Testing established that the M1 rifle found at defendant's residence was used in the USA Gas shooting.

Defendant was convicted by jury and sentenced by the court, as follows:

*Skyline Incident*

- Count 1: first degree murder (Pen. Code, § 187, subd. (a))[1] of Roberto Hernandez, with a multiple-murder special circumstance (§ 190.2, subd. (a)(3); life without the possibility of parole.

    o True findings on count 1:

        ▪ Intentional and personal discharge of firearm causing death (§ 12022.53, subd. (d)); consecutive 25 years to life.

        ▪ Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.

- Count 2: willful, deliberate, and premeditated attempted murder of Alejandro Salazar (§§ 664, 187, subd. (a)); consecutive 15 years to life.

    o True findings on count 2:

        ▪ Intentional and personal discharge of firearm causing great bodily injury (§ 12022.53, subd. (d)); concurrent 25 years to life.

        ▪ Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.

---

[1] Hereafter, citations to an unspecified code are to the Penal Code.

- Count 3: Shooting at an inhabited dwelling (§ 246); concurrent seven years.
  - True finding on count 3:
    - Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.
- Count 4: prohibited person in possession of a firearm (§ 12021, subd. (e)); consecutive three years.

*USA Gas Incident*

- Count 5: first degree murder (§ 187, subd. (a)) of Francisco Bernardino, with a multiple-murder special circumstance (§ 190.2, subd. (a)(3)); life without the possibility of parole.
  - True findings on count 5:
    - Intentional and personal discharge of firearm causing death (§ 12022.53, subd. (d)); consecutive 25 years to life.
    - Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.
    - Personal use of an assault weapon (§ 12022.5, subd. (b)); consecutive 10 years.
- Count 6: willful, deliberate, and premeditated attempted murder of Raul Abundes (§§ 664, 187, subd. (a)); consecutive 15 years to life.
  - True findings on count 6:
    - Intentional and personal discharge of firearm causing great bodily injury (§ 12022.53, subd. (d)); concurrent 25 years to life.
    - Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.
    - Personal use of an assault weapon (§ 12022.5, subd. (b)); concurrent 10 years.
- Count 7: shooting at an occupied motor vehicle (§ 246); concurrent seven years.
  - True findings on count 7:
    - Intentional and personal discharge of firearm causing great bodily injury or death (§ 12022.53, subd. (d)); concurrent 25 years to life.

- Personal use of a firearm (§ 12022.5, subd. (a)); 10 years stayed.

- Personal use of an assault weapon (§ 12022.5, subd. (b)); 10 years stayed.

- Count 8: possession of an assault weapon (§ 12280, subd. (b)); three years stayed.

- Count 9: prohibited person in possession of a firearm (§ 12021, subd. (e)); three years stayed.

*Additional Counts*

- Count 10: possession of an assault weapon (§ 12280, subd. (b)); three years stayed.

- Count 11: prohibited person in possession of a firearm (§ 12021, subd. (e)); three years stayed.

Additional factual and procedural background is included in the Discussion as relevant to the issues raised.

DISCUSSION

I

*Motion to Suppress*

Defendant contends that his Fourth Amendment rights were violated by the search of a vehicle in the front yard of his residence, and, if his claim fails for lack of standing, as the trial court concluded, his Sixth Amendment right to counsel was violated by his attorney, who failed to present evidence of standing. Neither contention has merit.

A.    *Background*

Before trial, on August 12, 2011, defendant filed a motion to suppress evidence obtained from the search of a green Saturn located in the front yard of his residence. The search was based on two search warrants issued with respect to defendant's residence.

The first warrant specifically described two other vehicles but also included authorization to search "any vehicles under the control of [the real property] or the occupants of the premises to be searched, at the time the warrant is to be served as

7

established by DMV documents and records, possession of keys or actual use of the vehicles and/or statements of the witnesses."

During the search under the first warrant, the officers found the green Saturn. An officer asked defendant's mother who owned the vehicle, and the mother said it belonged to a friend named Yolanda, who had left the vehicle on her property. A records check revealed that a release of liability was issued to defendant's mother.

An officer began to search the green Saturn under authorization of the first warrant. He opened the trunk and found a rifle with a pistol grip handle. Upon making this discovery, the search of the green Saturn was suspended and officers sought and obtained a second warrant specifically authorizing a search of the green Saturn. The rifle found in the trunk of the green Saturn turned out to be the .30-caliber M1 carbine rifle used in the USA Gas incident.

In his motion to suppress, defendant argued: "There was never probable cause to justify a search of the green 1997 Saturn at issue, so the First Warrant was consequently overbroad and accordingly invalid as a basis for a search of that Saturn. The Second Warrant, issued without any further probable cause than its predecessor, is tainted by the fruit of the poisonous tree gained from the First Warrant, as are any observations of and seizures from the green 1997 Saturn made under its authority."

Relying on the affidavits filed by the Stockton Police Department in support of the issuance of the two search warrants, defendant argued at the hearing on his motion to suppress that he had standing—a reasonable expectation of privacy—as to the green Saturn parked in the yard of his residence. On October 7, 2011, the trial court denied the motion to suppress, finding that the affidavits did not support defendant's standing argument.

On January 13, 2012, defendant requested permission to renew his motion to suppress, claiming that evidence had been discovered that defendant owned the green Saturn. A witness said the green Saturn belonged to defendant, it had a blown engine or

8

other problem, and the witness and defendant sat in the vehicle to smoke marijuana. The witness never saw defendant work on the vehicle. The trial court granted the request to renew the motion to suppress, but defendant later, on May 1, 2012, withdrew the renewed motion because he was unable to locate the witness.

On December 10, 2012, defendant again requested permission to renew his motion to suppress, and the trial court granted the request. Defendant presented evidence of a witness's statements that (1) the green Saturn was parked on the lawn in front of defendant's residence, (2) it had been sitting in the same spot for several months, (3) the witness never saw defendant driving the vehicle, (4) the witness did not know whether defendant kept his belongings in the vehicle, (5) the vehicle did not run, (6) the witness and defendant entered the vehicle to smoke marijuana. (7) the witness never saw defendant work on the vehicle, and (8) the witness never saw anyone else enter the vehicle. Opposing the motion to suppress, the prosecution submitted a statement by defendant denying ownership or any possessory interest in the vehicle. Having reconsidered the motion to suppress, the trial court again denied it, finding that there was no standing.

B.    *Analysis*

Defendant asserts he presented sufficient evidence to establish standing to challenge the search of the green Saturn. In the alternative, he asserts his attorney violated his Sixth Amendment right to counsel by failing to submit available evidence of standing.

1.    Standing

We need not determine whether the trial court erred with respect to the standing determination because, even assuming for the sake of argument defendant had standing to challenge the search of the green Saturn, defendant fails on appeal to establish prejudice in the trial court's determination that defendant did not have standing.

9

When a trial court errs with respect to a motion to suppress, we cannot reverse unless there is a miscarriage of justice. (Cal. Const., art. VI, § 13.) If the error was harmless beyond a reasonable doubt, there is no miscarriage of justice. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 972 [any error in denial of suppression motion analyzed under harmless-beyond-a-reasonable-doubt standard].)

In his appellate claim that the trial court's standing determination caused prejudice, defendant focuses on whether, without the evidence obtained from the green Saturn, including the rifle used in the USA Gas incident, it would have been more difficult to convict him. By focusing on that question, he neglects preliminary steps he must take to successfully establish prejudice. Specifically, he has failed to establish that, if the trial court had found standing, it would have necessarily found that his Fourth Amendment rights were violated, thus requiring suppression of evidence. Defendant is not entitled to assume that the motion to suppress would have been granted if the trial court found standing. We conclude that the motion to suppress would have been denied, even if the trial court had found standing, because the first warrant allowed the officers to search the green Saturn.

The first warrant issued with respect to defendant's residence allowed officers to search "any vehicles" on the property. That category included the green Saturn, which was on the front lawn. Therefore, the search of the green Saturn was done pursuant to a warrant.

Defendant notes in his opening brief that, in the trial court, he argued the first search warrant was overbroad to the extent the "any vehicles" language allowed a search of the green Saturn. However, he neither renews that argument in his opening brief nor cites authority for the proposition that the first warrant was overbroad to the extent the "any vehicles" language of the warrant allowed a search of the green Saturn. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [failure to cite authority forfeits appellate review of

10

issue].)  On its face, the first warrant allowed a search of the green Saturn because it was within the scope of the "any vehicles" language of the warrant.

Even in his points and authorities in support of his motion to suppress before trial, where defendant argued that the first warrant was overbroad, he provided no authority for that proposition.  He argued, without authority, that nothing in the affidavit supporting the search warrant connected defendant to the green Saturn.

In any event, the first warrant was not overbroad as to the "any vehicles" provision.  Whether a warrant is sufficiently particular is a question of law subject to independent review by an appellate court.  (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.)  In analyzing this question, we consider the purpose of the warrant, the nature of the items sought, and the totality of the circumstances surrounding the case.  "A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense.  [Citation.]"  (*Id*. at pp. 133-134.)

Defendant was identified in the affidavit as the principal suspect in the crimes, and it was reasonable to believe he may have stashed evidence of his crimes in a vehicle on the premises other than the vehicles he had been seen driving.  The same probable cause that connected defendant to the inside of the residence also connected him to the inoperative green Saturn on the front lawn.  Thus, the first warrant was not overbroad in that it allowed the officers to search for evidence of the crimes in the green Saturn.  The first warrant did not violate the Fourth Amendment, and the trial court would have properly denied his motion to suppress, even if it had found standing.

2.      Effective Assistance of Counsel

In a video made by defendant, seized by law enforcement, provided to the defense, and used as evidence against defendant at trial, defendant briefly shows the green Saturn and refers to it as "my little Saturn."  Defendant contends on appeal that his attorney's

11

failure to provide this evidence in support of his standing to challenge the search of the green Saturn violated his right to counsel.

To prevail on his ineffective assistance claim, defendant must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).)

As to the first prong—deficient performance—a "strong presumption" exists that counsel acted professionally. (*Strickland, supra*, 466 U.S. at p. 689.)

As for the second prong—prejudice—"[d]efendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id*. at p. 697.)

This is a case in which it is easy to dispose of the ineffectiveness claim based on the absence of prejudice. As discussed above, even if the trial court had found that defendant had standing to challenge the search of the green Saturn, it would have properly denied defendant's motion to suppress because the green Saturn was searched lawfully under the first warrant. Since there was no probability that counsel's failure to present the video evidence in connection with the motion to suppress would have produced a different result for defendant, his claim that his attorney violated his right to counsel is without merit.

II

*Wiretap Application*

In the trial court, defendant moved to suppress evidence obtained by wiretap, and the court denied the motion. On appeal, defendant contends: (1) the court employed the wrong test for probable cause in considering the motion to suppress, (2) the documents attached to the wiretap request were improperly sealed, and (3) there was no probable cause supporting the wiretap authorization. As noted above, we conclude: (1) the court employed the correct test for probable cause, (2) the documents attached to the wiretap request were properly sealed, and (3) there was probable cause to support the wiretap authorization.

A defendant who believes that evidence was "obtained in violation of the Fourth Amendment of the United States Constitution or of [California's Wiretap Act[2]]" may move to suppress its use at trial. (§ 629.72.) Such a motion is "subject to review in accordance with the procedures set forth in Section 1538.5." (§ 629.72; *People v. Jackson* (2005) 129 Cal.App.4th 129, 145-146 (*Jackson*).)

Under the current version of the Wiretap Act, "the designated judge may authorize a wiretap if [1] there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); [2] there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); [3] there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and [4] '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be

---

[2]     We refer to the Presley-Felando-Eaves Wiretap Act of 1988 (§ 629.50 et seq.) as the Wiretap Act.

13

unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d))." (*People v. Leon* (2007) 40 Cal.4th 376, 384 (*Leon*).)

"The magistrate's determination of probable cause is entitled to deferential review. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1041.)

"The analysis of a [wiretap] suppression motion focuses on violations of the statutory procedures and not on constitutional violations, because while it is possible to violate a core principle of the statute without violating the Fourth Amendment it would not seem possible to violate the Fourth Amendment without also violating a core statutory principle." (*Jackson, supra,* 129 Cal.App.4th at p. 149.) Therefore, the first question to be answered in analyzing a motion to suppress wiretap evidence is whether the defendant established a violation of the Wiretap Act. If the defendant did not establish a violation of the Wiretap Act, there is no constitutional violation and no suppression. (*Ibid.*)

A.      *Background*

During the investigation of defendant's crimes, the district attorney's office filed an application for a wiretap authorization. The application asserted that: (1) defendant committed murder and other crimes; (2) a wiretap of his cell phone would yield evidence of the crimes; (3) the cell phone was commonly used by defendant; and (4) normal investigative techniques were ineffective or too dangerous.

In support of the wiretap application, the district attorney's office filed an affidavit of Detective Kathryn Nance of the Stockton Police Department. The affidavit described defendant and identified his cell phone. It also set forth facts relating to nine incidents that Detective Nance asserted were support for the necessary probable cause determinations.

In Incident One, someone pulled up in a black and gray Lexus next to Roberto Hernandez and shot at him. Hernandez was not struck, but his car was. He knew who the gunman was but would not identify the gunman to the officer who spoke to him.

14

In Incident Two, someone shot Roberto Hernandez and Alejandro Salazar. Hernandez died of his injuries. Salazar told the officer that he believed defendant was the gunman because there had been problems between Hernandez and defendant. Salazar had heard that defendant was responsible for the shooting in Incident One. Defendant, in a purple Buick, had been following Hernandez and Salazar earlier that day. Salazar identified a photo of defendant. Jose Cordova was present during the shooting but did not see the gunman. Hernandez had told him earlier that he had some problems with some "black people." David Jimenez saw the shooting and saw a person with dark skin, wearing a hoodie, in an area where shell casings were later found. Jorge Sanchez said he had seen defendant in a purple Buick and had heard he also drove a Lexus. Sanchez saw the shooting and said that an "Asian guy and a black guy were shooting from the bushes." Sanchez did not know defendant but heard that defendant was the one who shot at Hernandez. A police detective questioned defendant about the shooting. Defendant told the detective he had a gray Lexus and a purple Buick. Defendant gave the detective his cell phone number, and the detective later called defendant and talked to him at that number.

In Incident Three, someone in a group of men on foot shot at a passing car, killing one of its occupants. Defendant's Lexus was found in the area, but defendant did not appear to claim his car.

In Incident Four, an anonymous caller said he saw defendant in a purple car, along with other Black males, get into an argument with Hispanic males in a white car. Eventually, gunfire was exchanged. The caller was upset that defendant had not been arrested for killing Hernandez, and the caller reported that defendant had an AK47-type rifle. An independent report verified that there had been gunfire in the area at the time reported by the anonymous caller.

In Incident Five, an anonymous caller said that several Black and Hispanic males were inside a vacant house with AK47 rifles. When officers arrived at the vacant house,

15

someone peeked out a side door and immediately went back in. Several Black and Hispanic males ran out of the house, escaping through backyards. The officers found two rifles inside the house. A confidential attachment to the affidavit in support of the wiretap request related to this incident.

In Incident Six, a Black male shot at a group of Hispanic males, hitting three of them. When shown a photo lineup including defendant, one of the victims said he thought that defendant looked like the gunman.

In Incident Seven, a Black male and another person shot at two victims as they sat in their car near the USA Gas station. Both victims were injured, and one of them died. Earlier that evening, defendant's cousin Maurice had been in an altercation with friends of the victims at a nightclub in Modesto. Several anonymous callers reported to officers that defendant told them that he was one of the gunmen involved in the USA Gas incident and was the gunman involved in the death of Roberto Hernandez, and the deceased victim's father also heard that his son had been killed by defendant.

In Incident Eight, a detective drove to defendant's home and watched while defendant answered a phone call from another detective. They did this to verify that the phone was in defendant's possession.

Incident Nine was detailed in a confidential attachment because it involved information from a confidential informant who had been reliable in giving information to the Stockton Police Department in the past. We need not give the details of this confidential attachment.

The incidents all took place from October 2009 to February 2010.

Based on the incidents summarized in the application for wiretap authorization, Detective Nance expressed the belief that "[defendant] is responsible and involved in the aforementioned cases. He is closely tied with all of the people described above and has been named as being involved by Confidential Reliable Informants, anonymous callers and victims of the above-described crimes. Based on the information obtained up to this

16

point in the investigation, your affiant believes that he was not acting alone while committing the crimes. At this point in the investigation, the other people involved have not been identified or located. It is believed that [defendant] is in contact with these [co]conspirators. It is believed that [defendant] will have further communications about the prior crimes and other shootings being planned and the intended victims."

Detective Nance also gave facts concerning the Stockton Police Department's use of available investigative approaches and the necessity for using a wiretap to obtain further evidence. We need not provide those details here.

The judge authorized the wiretap and ordered that the application and court order be sealed.

Before trial, defendant asked the court to unseal the attachments to Detective Nance's affidavit in support of the wiretap request. Defendant also moved to suppress evidence obtained as a result of the wiretap.

The trial court denied the motion to unseal the attachments and denied the motion to suppress evidence obtained as a result of the wiretap, finding, under the totality of the circumstances, there was probable cause to issue the wiretap authorization.

B.      *Analysis*

1.      Probable-cause Test

Defendant claims that the trial court erred by testing the reliability of the affidavits filed in support of the wiretapping order using a totality-of-the-circumstances test rather than employing a standard that requires particularized corroboration of informant tips, a test known as the *Aguilar-Spinelli* test (*Aguilar v. Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723] (*Aguilar*); *Spinelli v. United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637] (*Spinelli*)). Defendant claims that, although the United States Supreme Court discarded the *Aguilar-Spinelli* test in favor of a totality-of-the-circumstances test in *Illinois v. Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527] (*Gates*), affidavits in support of wiretap authorizations in California must be tested using the *Aguilar-Spinelli* test because (1) the

17

Wiretap Act was enacted after Proposition 8's truth-in-evidence provision was added to the California Constitution and (2) the Wiretap Act was passed by at least a two-thirds vote in each houses of the Legislature, thus excepting it from the truth-in-evidence provision. The contention is without merit because, even though the wiretap statute was adopted by a two-thirds vote of each house of the Legislature after Proposition 8 was passed, there is no indication that the Legislature intended to adopt the *Aguilar-Spinelli* test. In other words, the Legislature could have, but did not, adopt the *Aguilar-Spinelli* test for wiretap probable-cause determinations.

In the 1960's, the United States Supreme Court formulated a test to determine whether allegations of an informant, supplied to the magistrate by hearsay, are sufficient to establish probable cause for a warrant (in general, and not necessarily with respect to a wiretap authorization). This *Aguilar-Spinelli* test required that the affidavit in support of the warrant (1) allege the informant's statement in factual, rather than conclusionary, language and establish the informant's personal knowledge and (2) contain sufficient underlying factual information reasonably supporting the informant's credibility and the information's reliability. (*Aguilar, supra,* 378 U.S. 108; *Spinelli, supra,* 393 U.S. 410; see also *People v. Smith* (1976) 17 Cal.3d 845, 850.)

The California Supreme Court used the *Aguilar-Spinelli* test, as mandated by the binding United States Supreme Court precedents of *Aguilar* and *Spinelli*, to review California probable-cause determinations. (See *People v. Smith, supra,* 17 Cal.3d at p. 850.) According to the California Supreme Court, the *Aguilar-Spinelli* test was " 'a convenient shorthand articulation of previously established principles of California law in the area of hearsay affidavits.' [Citation.]" (*People v. Belmontes* (1988) 45 Cal.3d 744, 768, fn. 3 (*Belmontes*), overruled on other grounds in *People v. Cortez* (2016) 63 Cal.4th 101, 118, and *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

In *Gates*, decided in 1983, the United States Supreme Court "abandon[ed]" the two-pronged *Aguilar-Spinelli* test for determining probable cause and in its place adopted

18

a "totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations." (*Gates, supra,* 462 U.S. at pp. 233, 238.) The court described the new test: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed. [Citation.]" (*Id.* at pp. 238-239.) The *Gates* court reasoned that the totality-of-the-circumstances test is a "practical, nontechnical conception." (*Id.* at p. 231.) Therefore, the court concluded that the "rigid" "two-pronged [*Aguilar-Spinelli*] test" was not suitable for testing probable cause. (*Gates, supra,* 462 U.S. at pp. 230-231 & fn. 6.)

Before 1982, California courts imposed their own rules and tests on the admissibility and exclusion of evidence obtained by search and seizure. Many of these rules and tests were based on independent state grounds more restrictive, as to admission of evidence, than was required by the United States Constitution, as interpreted by the United States Supreme Court. (See, e.g., *People v. Brisendine* (1975) 13 Cal.3d 528, 548-552 (*Brisendine*), abrogated by Prop. 8 [independent state grounds].)

In 1982, California voters passed Proposition 8, eliminating independent state grounds as a means for exclusion of evidence. The truth-in-evidence provision of Proposition 8 prohibited exclusion of relevant evidence unless the United States Constitution requires exclusion. As an exception, Proposition 8 allowed exclusion of relevant evidence admissible under the United States Constitution only if a subsequent statute, passed by a two-thirds vote of each house of the Legislature, provided for

19

exclusion.[3]  (Cal. Const., art. I, § 28, subd. (f)(2).)  "Proposition 8 . . . eliminate[d] a judicially created remedy for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled."  (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887, italics omitted.)  The California Supreme Court concluded that "*Brisendine* and other state-law-based search-and-seizure cases were superseded by the enactment of Proposition 8.  (See Cal. Const, art. I, § 28, subd. [(f)(2)] [right to truth-in-evidence provision]; *In re Lance W.*[, *supra*,] 37 Cal.3d 873 [(*Lance W.*)] [upholding same].)"  (*People v. Monge* (1997) 16 Cal.4th 826, 873, fn. 4.)

After the United States Supreme Court decided *Gates* in 1983, Proposition 8 had the effect of prohibiting California courts from using the two-pronged *Aguilar-Spinelli* probable-cause test because use of that test could result in exclusion of evidence that would be admissible under the *Gates* totality-of-the-circumstances test.  As California courts have recognized since *Gates* was decided, the truth-in-evidence provision requires that the *Gates* totality-of-the-circumstances test must be applied in California to determine probable cause for crimes committed after enactment of Proposition 8, not the more rigid *Aguilar-Spinelli* test abandoned by the United States Supreme Court.  (See *People v. Love* (1985) 168 Cal.App.3d 104, 107-108 [applying *Gates*]; *People v. Medina* (1985) 165 Cal.App.3d 11, 16-18 [same]; see also *Belmontes, supra,* 45 Cal.3d at p. 768, fn. 3 [applying *Aguilar-Spinelli* because crime committed before Prop. 8]; *People v. Kershaw* (1983) 147 Cal.App.3d 750, 754, fn. 2 [same].)

Six years after Proposition 8 passed, the Legislature adopted the Wiretap Act and later amended it in 1995, as relevant here.  (Stats. 1988, ch. 111, § 2, p. 450; Stats. 1995,

---

[3]     "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ."  (Cal. Const., art. I, § 28, subd. (f)(2).)

ch. 971, § 10, p. 7395.) This act "authorized specified law enforcement officials to apply for a court order to intercept wire communications, but only where there was probable cause to believe the target was involved in [specified crimes]." (*Leon, supra,* 40 Cal.4th at p. 383.) So the Wiretap Act is a post-Proposition 8 statute passed by a two-thirds vote of each house of the Legislature. "By its terms the truth-in-evidence clause [of Proposition 8] does not apply to a statute 'hereafter enacted by a two-thirds vote of the membership in each house of the Legislature.' Section 629.72 [providing for exclusion of evidence] was enacted in 1995, 13 years after the adoption of the truth-in-evidence clause. At the time of its enactment there were 40 members of the Senate. The bill passed the Senate by a vote of 28 to two (92 percent). There were 80 members of the Assembly. The bill passed by a vote of 62 to five (77.5 percent). Thus, suppression of evidence under section 629.72 is not prohibited by the truth-in-evidence clause of the California Constitution." (*Jackson, supra,* 129 Cal.App.4th at pp. 152-153, fns. omitted.) We therefore look to the terms of the Wiretap Act to determine what test to apply in evaluating whether evidence obtained by wiretap must be suppressed.

Matters of statutory interpretation are questions of law subject to de novo review. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 790.) When we construe a statute, we seek to determine and give effect to what the Legislature intended. And the most reliable indicator of what the Legislature intended is found in the words used. (*People v. King* (2006) 38 Cal.4th 617, 622.)

The Wiretap Act allows a defendant to move to suppress evidence obtained by wiretap "only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter." (§ 629.72.) Notably, this provision does not provide for suppression of evidence if it is obtained in violation of the California Constitution. The omission of other reasons for exclusion is evidence of the Legislature's intent to limit exclusion to violations of (1) the United States Constitution, which uses the *Gates* totality-of-the-circumstances test, and

21

(2) violations of the Wiretap Act. However, defendant argues that the language includes exclusion of evidence obtained in violation of the California Constitution, invoking the *Aguilar-Spinelli* test, because, in his words, "[t]he probable cause requirement of the statutory scheme flows from . . . the California Constitution and thus plays a central role in the wiretap statute and cannot be satisfied by other means." (Fn. omitted.) This argument, though creative, is unconvincing because nothing in the Wiretap Act evinces a legislative intent to adopt the abandoned *Aguilar-Spinelli* test as an independent state ground for exclusion of evidence.

In attempting to establish that the Legislature meant to adopt the *Aguilar-Spinelli* test, defendant focuses on section 629.50, which requires the judge to make probable-cause determinations when considering whether to authorize a wiretap.[4] The statute does not designate what probable-cause test to use. According to defendant, this failure to designate a probable-cause test necessarily means that the *Aguilar-Spinelli* test must be used because it is California's probable-cause test, as seen in the cases in which the crimes were committed before Proposition 8 was passed. This argument, however, contradicts the Legislature's express limitation of grounds for exclusion to violations of the Fourth Amendment and of the Wiretap Act. (§ 629.72.) Section 629.50 does not designate the test to be used in the probable-cause determination and does not evince a legislative intent to exclude evidence when a violation is determined using the *Aguilar-Spinelli* test. More likely, the Legislature, by not designating a test or including reference to the California Constitution, intended the courts to use the same test used in all other probable-cause determinations in California—the *Gates* totality-of-the-circumstances

---

[4] For example, section 629.50 requires the court to determine whether probable cause supports a belief that "additional communications of the same type will occur thereafter" and, in the case of modification of a wiretap authorization, "the person or persons identified in the original order have commenced to use a facility or device that is not subject to the original order." (Subd. (a)(5)&(8).)

test.  (See *People v. Love, supra,* 168 Cal.App.3d at pp. 107-108 [applying *Gates*]; see also *Lance W., supra,* 37 Cal.3d at p. 896 [Legislature did not intend to abrogate truth-in-evidence provision by reenactment of § 1538.5].).)

If the Legislature, when enacting the Wiretap Act, had intended to adopt the *Aguilar-Spinelli* test for determining probable cause and deciding whether to exclude evidence obtained by wiretap, it could have done so expressly.  It did not.  Instead, it expressly authorized exclusion of evidence only for violation of the Fourth Amendment (which invokes the *Gates* totality-of-the-circumstances test) or a violation of the Wiretap Act, itself.  This inclusion of two bases for suppression and the omission of reference to the California Constitution or a violation of rights determined using the *Aguilar-Spinelli* test is compelling evidence the Legislature did not intend to exclude evidence as a result of the application of the *Aguilar-Spinelli* test.  (*People v. Superior Court (Ramirez)* (1999) 70 Cal.App.4th 1384, 1391 [presumption that omission in statute is intentional].)

Finally, the Legislature intended the Wiretap Act to conform to federal law, as reflected in title III of the Omnibus Crime Control and Safe Streets Act of 1968.  (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1196.)  Exclusion under federal law is necessary only for violation of the Fourth Amendment or of the federal wiretap statute, not for any California-specific reason.

Nothing in the Wiretap Act or its history convinces us the Legislature intended to adopt the *Aguilar-Spinelli* test for determining probable cause in support of wiretap authorization.  Therefore, the trial court correctly applied the *Gates* totality-of-the-circumstances test.

2.      Sealing of Documents

On appeal, defendant asks us to review the sealed record of the in camera proceedings, held in accordance with *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*).  Having reviewed the sealed record, we conclude that the court fully complied with *Hobbs*

23

and correctly ordered that the two attachments to Detective Nance's affidavit to be sealed.

A defendant may move to suppress evidence obtained as the result of a search warrant on the ground there was no probable cause for the issuance of the warrant. (§ 1538.5, subd. (a)(1)(B)(iii).)  Under *Hobbs*, "[o]n a properly noticed motion by the defense seeking to quash or traverse [a] search warrant" where any part of the search warrant affidavit has been sealed, "the lower court should conduct an in camera hearing . . . .  It must first be determined whether sufficient grounds exist for maintaining the confidentiality of the informant's identity.  It should then be determined whether the entirety of the affidavit or any major portion thereof is properly sealed, i.e., whether the extent of the sealing is necessary to avoid revealing the informant's identity."  (*Hobbs, supra*, 7 Cal.4th at p. 972, fn. omitted.)

We independently review the court's decision to seal a portion of the search warrant affidavit.  (See *People v. Martinez* (2005) 132 Cal.App.4th 233, 241-242.) Based upon our review of the transcripts of the in camera proceedings and the attachments to Detective Nance's affidavit, we conclude that the court did not err in refusing to unseal the entire search warrant affidavit or in determining which portions had to remain under seal in order to maintain the confidentiality of confidential informants.

### 3.     Wiretap Authorization

Defendant contends that evidence obtained by wiretap should have been suppressed because unsealed parts of Detective Nance's affidavit did not support the necessary probable-cause determinations connecting defendant to the crimes.  In making this contention, defendant applies the two-pronged *Aguilar-Spinelli* test, attacking the reliability and credibility of the affiant.  However, as we established above, the *Aguilar-Spinelli* test does not apply to a motion to suppress evidence obtained by wiretap.  As a result, defendant's contention that Detective Nance's affidavit did not provide sufficient reliable and credible evidence to support the necessary probable-cause determination

24

applies the wrong test and is therefore without merit. Defendant's attack on the wiretap authorization could succeed on appeal only if he were to establish that the trial court erred under the totality-of-the-circumstances test. He makes no attempt to do that, so he fails to establish that there was insufficient evidence to support the necessary probable cause determinations in authorizing a wiretap. (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [appellant bears burden of affirmatively establishing error].) In any event, Detective Nance's affidavit, including the sealed parts, recounted several sources identifying defendant's probable involvement in the murders and the need for a wiretap to develop the case against him and to identify any others involved in the crimes.

III

*Motion to Sever*

Defendant contends the trial court abused its discretion by denying his motion to sever the Skyline incident from the USA Gas incident for trial. The contention is without merit.

A.    *Procedure*

Defendant moved to sever the Skyline counts from the USA Gas counts. He claimed: (1) the evidence of the two incidents would not be cross-admissible because there was no similar motive, plan, or weapons used between the two incidents; (2) the USA Gas facts were more inflammatory than the Skyline facts; and (3) the evidence of his guilt of the Skyline crimes was weaker than the evidence of his guilt of the USA Gas crimes.

The trial court denied the motion and denied it again when defendant subsequently renewed it. The court found that the evidence supporting both incidents was strong, there was cross-admissibility of evidence as to motive (revenge) and common plan (ambush), and neither incident would "unusually inflame the jury against the defendant."

25

B.    *Law*

Section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." The law favors joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.) Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately. (§ 954; see *People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*).) " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion. (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.) "In assessing potential prejudice, we examine the record before the trial court at the time of its ruling. The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case. [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1128-1129, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

Cross-admissibility in both directions is not required. It is sufficient if evidence of one crime is cross-admissible as to the other crime. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1129 ["it is enough that the assaults were admissible in the murder case; 'two-way' cross-admissibility is not required"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"].)

C.      *Analysis*

Defendant renews his arguments on appeal.  He contends that the trial court abused its discretion by denying the motion to sever because:  (1) the incidents were not cross-admissible, (2) the facts of the USA Gas crimes were inflammatory, (3) the stronger USA Gas case bolstered the weaker Skyline case, (4) joinder converted the action into a capital case, and (5) the benefits of joinder were minimal.

Basing its decision on the evidence produced at the preliminary hearing, the trial court properly denied defendant's motion to sever because the incidents were cross-admissible—the motive and the plan were the same, supporting an inference that defendant committed both crimes.

Defendant committed both shootings in revenge:  the Skyline shootings were defendant's response to his perception that Hernandez and his friends had disrespected him and shot at him, and the USA Gas shootings were defendant's response to his friend being punched at a nightclub earlier that evening.  Defendant claims, because he was not personally involved in the fight at the nightclub, the USA Gas shootings were not revenge.  To the contrary, defendant committed the USA Gas shootings in revenge because his friend was hit at the nightclub in Modesto that night.

Defendant committed both shootings by ambushing the victims:  defendant hid behind a bush and shot the unsuspecting victims in the Skyline incident, and defendant approached from behind the parked car at the USA Gas station and opened fire, thus pouncing on the victims unsuspectedly in both incidents.  In each incident, he used a semiautomatic firearm and fired numerous shots quickly.

" 'Pursuant to Evidence Code section 1101, subdivision (b), evidence that a defendant has committed an offense, although inadmissible to demonstrate a defendant's disposition to commit crimes, may be received to establish, among other things, identity, intent, motive, or plan.  To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in

27

combination, support a strong inference that the defendant committed both crimes. [Citations.]' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1154-1155, italics omitted.) The crimes need not be identical, but they must have commonalities, to be cross-admissible. (*Id*. at p. 1155.) Here, the commonalities (revenge and ambush) were sufficient to find cross-admissibility.

Cross-admissibility dispels any inference of prejudice. (*People v. Bradford, supra,* 15 Cal.4th at p. 1316.) However, even assuming the two incidents were not cross-admissible, the trial court did not abuse its discretion under the remaining relevant factors by denying the motion to sever the two incidents.

First, the two incidents were both violent and egregious. To say that the USA Gas crimes were more inflammatory than the Skyline crimes is to get unnecessarily and unworkably fine in trying to predict a jury's reaction to such malevolent actions.

Second, the evidence of defendant's guilt as to one incident was not substantially stronger than the evidence as to the other incident. As to the Skyline incident, the evidence showed that defendant threatened to kill the victims within an hour before the shootings. The description of the gunman fit defendant, including the sweatshirt defendant was wearing when he threatened the victims. Cell phone records placed defendant in the vicinity of the shootings. And Salazar identified defendant as the gunman. As to the USA Gas incident, cell phone records again placed defendant in the vicinity of the shootings. And testing established that the M1 carbine rifle in the trunk of the green Saturn on defendant's front lawn was used in the shootings.

And third, although the joinder made possible the multiple-murder special circumstance allegation, defendant proffers no authority that just this one factor alone supports a finding that the trial court abused its discretion in denying the motion to sever.

We therefore conclude that the trial court did not abuse its discretion by denying the motion to sever and defendant has not established that joinder of the two incidents for

28

trial "actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

IV

*Instructions on Lesser Included Offenses*

Defendant contends that the trial court erred by not instructing, sua sponte, on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter as they related to the Skyline incident. We conclude that the trial court did not err because, even assuming without deciding that the trial court should have given the instructions, it is not reasonably probable that the failure to give the instructions affected the outcome.

A.   *Background*

Defendant limits this contention to the Skyline incident (counts 1 & 2) and does not make the same contention as to the USA Gas incident.[5]

As to count 1 (the Skyline murder of Hernandez), the court instructed the jury concerning the elements of murder, including malice. The court also instructed the jury that it could render a verdict of first degree murder if it found that he (1) acted willfully, deliberately, and with premeditation or (2) committed the murder by lying in wait. If the jury found murder, but not first degree murder, it was required to render a second degree murder verdict.

The jury convicted defendant of first degree murder on count 1.

As to count 2 (the Skyline attempted murder of Salazar), the court instructed the jury concerning the elements of attempted murder. The court also instructed the jury that, if it found defendant guilty of attempted murder, it would then be required to determine whether the attempted murder was done with deliberation and premeditation. The

---

[5]   Defendant misidentifies the count numbers in his opening brief, but the context and argument make it clear that he is making the contention only as to counts 1 and 2.

instruction included a definition of deliberation, meaning he "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." The court cautioned the jury that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."

The jury convicted defendant of attempted murder on count 2. It also found that the attempted murder was willful, deliberate, and premeditated.

The court did not instruct on voluntary manslaughter or attempted voluntary manslaughter.

B.    *Law*

A trial court must instruct on all lesser included offenses supported by the evidence presented at trial. Substantial evidence is evidence from which a reasonable jury could conclude that the lesser offense, but not the greater, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Manslaughter is the unlawful killing of a human being without malice. (§ 192.) Voluntary manslaughter may occur in two limited circumstances: when the defendant acts in a sudden quarrel or heat of passion, or when the defendant kills in an unreasonable but good faith belief in having to act in self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199.) Here, defendant does not assert the evidence supported instructions on imperfect self-defense, so we consider only whether he acted in a heat of passion.

Similarly, attempted murder is commission of a direct but ineffectual step toward killing someone while intending to kill. (*People v. Stone* (2009) 46 Cal.4th 131, 136.) For purposes of sentence enhancement, the prosecution may seek an additional jury finding that an attempted murder was willful, deliberate, and premeditated. (§ 664, subd. (a)); *People v. Bright* (1996) 12 Cal.4th 652, 669, overruled on another ground in *People*

*v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.) Attempted murder may be reduced to attempted involuntary manslaughter if the defendant attempted to kill in a heat of passion. (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824.)

In the context of voluntary manslaughter based on a killing done in the heat of passion, there must be provocation sufficient to arouse the passions of a reasonable person under the same circumstances. The fundamental inquiry is whether the defendant's reason was " ' "so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, overruled on another ground in *People v. Barton* (1995) 12 cal.4th 186, 200-201.)

To be entitled to voluntary manslaughter instructions under a heat of passion theory, "the killing must be 'upon a sudden quarrel or heat of passion' ( § 192); that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

Adequate provocation must be affirmatively demonstrated; it cannot be left to speculation. (*People v. Williams* (1969) 71 Cal.2d 614, 624.)

C.      *Analysis*

Defendant argues that the trial court should have given the voluntary manslaughter and attempted voluntary manslaughter instructions with respect to the Skyline incident because there was evidence that some time before the Skyline incident, on the same day, perhaps within a half-hour before the Skyline shootings, someone shot at defendant from Hernandez's car, thus provoking defendant to a heat of passion. We need not determine whether the trial court had a duty to instruct on voluntary manslaughter or attempted voluntary manslaughter because the jury necessarily concluded that defendant did not act

31

in a heat of passion—it found that defendant acted willfully, deliberately, and with premeditation, which is inconsistent with heat of passion.

"[A] trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual question adversely to the defendant under other instructions." (*People v. Mincey* (1992) 2 Cal.4th 408, 438.)

Defendant argues we must apply the federal harmless-beyond-a-reasonable-doubt standard because he is asserting that his federal constitutional rights were violated. However, he concedes that California Supreme Court precedent establishes that the state standard applies to the harmless error analysis when the trial court fails to instruct on a lesser included offense. (*Breverman, supra,* 19 Cal.4th at p. 165.) We are therefore bound to apply the state standard: "[S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*; *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Here, given the opportunity to convict defendant of second degree murder and attempted murder without premeditation and deliberation, the jury selected first degree murder and attempted premeditated murder. In other words, it found that defendant did not act rashly but instead, in the words of the court's instruction, "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 [premeditation and deliberation inconsistent with heat of passion].)

There is some ambiguity in the jury's first degree murder verdict because the jury was given the option of rendering a first degree murder verdict based on either (1) premeditation and deliberation or (2) lying in wait. And the verdict did not reveal which the jury chose. The attempted murder verdict, however, is not similarly ambiguous. The jury expressly found that defendant acted willfully, deliberately, and with premeditation. Since the two crimes were committed by ambush virtually

32

simultaneously, in a quick spray of bullets, there could be no argument that, while the jury found defendant acted with premeditation and deliberation with respect to the attempted murder, defendant did not similarly act with premeditation and deliberation with respect to the murder. Therefore, the verdict establishes that defendant did not act in a heat of passion when he gunned down Hernandez and Salazar during the Skyline incident.

Since there is no reasonable probability the failure to instruct the jury on voluntary manslaughter and attempted voluntary manslaughter affected the outcome of this case, any error in not giving those instructions was harmless.

V

*Enhancement for Personal Use of Firearm*

Defendant contends the trial court imposed an unauthorized sentence because it imposed but did not stay punishment for an assault weapon enhancement under section 12022.5, subdivision (b) for the same count in which the court imposed a firearm discharge causing death enhancement under section 12022.53, subdivision (d). We agree that the statutory scheme required the trial court to stay the enhancement under section 12022.5, subdivision (b) as to counts 5 and 6.[6]

As to count 5, the murder of Francisco Bernardino, the trial court imposed three firearm enhancements: (1) a consecutive 25 years to life under section 12022.53, subdivision (d); (2) 10 years *stayed* under section 12022.5, subdivision (a); and (3) a

---

[6] In his opening brief, defendant misstated which statute the trial court relied on to impose the assault weapon enhancement. He wrote that it was section 12022.53, subdivision (b), rather than section 12022.5, subdivision (b). The misstatement threw off the Attorney General, who argued, correctly, that defendant was not sentenced under section 12022.53, subdivision (b). In defendant's reply brief, he acknowledges the misstatement. While defendant's argument in his opening brief was defective, he did not forfeit it because the sentence is unauthorized. (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

consecutive 10 years under section 12022.5, subdivision (b), for an aggregate consecutive term of 35 years to life on the count 5 firearm enhancements.

As to count 6, the attempted murder of Raul Abundes, the trial court also imposed three firearm enhancements: (1) a concurrent 25 years to life under 12022.53, subdivision (d); (2) 10 years *stayed* under section 12022.5, subdivision (a); and (3) a concurrent 10 years under section 12022.5, subdivision (b), for an aggregate concurrent term of 35 years to life on the count 6 firearm enhancements.

At the time of defendant's crimes, section 12022.53, subdivision (f) provided, in part: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section . . . 12022.5 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section." (Stats. 2006, ch. 901, § 11.1, p. 7076.)

The California Supreme Court, in *People v. Gonzalez* (2008) 43 Cal.4th 1118, held that section 12022.53, subdivision (f), "require[s] that, after a trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of imprisonment, the remaining section 12022.53 firearm enhancements and any section 12022.5 firearm enhancements that were found true for the same crime must be imposed and then stayed." (*People v. Gonzalez, supra,* at p. 1123.)

We therefore conclude that the trial court should have imposed *and stayed* the 10-year term for the section 12022.5, subdivision (b) enhancement as to counts 5 and 6.[7]

---

[7] Defendant, in his brief, did not make this argument as to the concurrent firearm enhancements in count 6, but (1) the same principles apply and (2) as imposed the sentence was unauthorized.

## VI

### *Sentence for Attempted Murder*

As to counts 2 and 6, the attempted premeditated murders of Salazar and Abundes, the court sentenced defendant to a consecutive indeterminate term of 15 years to life each. However, the statutory term for attempted deliberate and premeditated murder is life with the possibility of parole, not 15 years to life. (§ 664, subd. (a).) Defendant contends that the trial court erred in sentencing him on counts 2 and 6, and the Attorney General agrees.

A person found guilty of attempted murder is subject to a sentence of life with the possibility of parole if the crime was willful, deliberate, and premeditated. (§ 664, subd. (a).) A person sentenced to life with possibility of parole is not eligible for parole until a term of seven years has been served, unless some other term is statutorily specified. (§ 3046, subd. (a)(1).)

We also agree the trial court imposed the wrong term for attempted deliberate and premeditated murder and will therefore modify the sentence.

## VII

### *Sufficiency of Evidence of Firearm Possession*

Defendant contends there was insufficient evidence to convict him of two separate instances of possessing a weapon because he committed only one continuous possession of the weapon. He claims we must strike the convictions predicated on his second possession of the weapon because there was no evidence he lost possession in the interim. We conclude the evidence is insufficient, as defendant contends, and that we must strike the conviction on those counts, as well as the terms imposed but stayed for those counts.

Based on his possession of the M1 assault rifle on February 7, 2010 (USA Gas incident), and again on March 10, 2010 (search of green Saturn trunk), defendant was convicted of two counts each (one for each date) of possession of an assault weapon

35

(former § 12280, subd. (b); counts 8 & 10) and possession of a firearm by an adjudged ward until 30 years of age (former § 12021, subd. (e); counts 9 & 11).  Defendant contends that counts 10 and 11 (based on finding the M1 rifle in the trunk of the green Saturn) must be reversed.  The trial court imposed but stayed three-year terms for counts 10 and 11.

Possession of a weapon in violation of former sections 12280, subdivision (b) and 12021, subdivision (e) is a continuing crime.  (See *People v. Mason* (2014) 232 Cal.App.4th 355, 365 (*Mason*).)  In *Mason*, the defendant was convicted of four counts of violating former section 12021.  He was proven to have possessed the same firearm on four separate dates, corresponding to the dates of three shootings and the date the firearm was recovered after he dropped it while fleeing from police.  (*Id.* at pp. 363-364.)  The Court of Appeal reversed three of the four convictions because "there was no evidence that [the defendant's] possession of the firearm was anything but continuous over the period encompassing the four dates."  (*Id.* at p. 366.)  The court explained:  "The Supreme Court has recognized that possession of a firearm by a felon is a continuing offense.  [Citations.] . . . [¶]  'In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.'  [Citations.]  Thus, our Supreme Court recognized more than 70 years ago that the Deadly Weapons Act, from which former section 12021 is derived, 'does not provide that it is an offense for each day that the ex-convict is in possession of the weapon. . . .'  [Citation.]"  (*Id.* at p. 365, quoting *People v. Warren* (1940) 16 Cal.2d 103, 112; see also *Wright v. Superior Court* (1997) 15 Cal.4th 521, 525, fn. 1.)

So defendant cannot be convicted of multiple counts of the same possession statute if he never relinquished possession of the weapon between the two dates.  However, here, the Attorney General claims there is sufficient evidence to support two convictions based on interim relinquishment of the weapon.  While the evidence relied on by the Attorney General is *some evidence* defendant *may* have relinquished and regained

36

possession of the M1 rifle during the relevant time, it does not constitute sufficient evidence upon which the jury could draw a reasonable inference. (See *People v. Memro* (1985) 38 Cal.3d 658, 695, overruled on other grounds, *People v. Gaines* (2009) 46 Cal.4th 172, 181 [evidence giving rise only to speculation or conjecture not substantial].)

The possession counts were based on defendant's possession of the M1 rifle on February 7, 2010, and again on March 10, 2010.

On February 18, 2010, defendant had a cell phone conversation with an unidentified caller. During the conversation, defendant told the caller he had an M1. The caller asked how much defendant wanted for it, and defendant replied: "Think want eight." The caller said he might call defendant back about it.

On March 2, 2010, defendant had a cell phone conversation with another unidentified caller. During the conversation about going to a location to acquire some flat-screen televisions from other people, defendant said he would not go alone. The caller said that "if you're by yourself, it don't matter, you got that .30 [the M1], don't you?" Defendant replied: "A .9 [nine-millimeter]." The caller asked if it was the one defendant showed him the day before, and defendant said that it was.

When the M1 rifle was analyzed for DNA samples, DNA from five different people was found.

The Attorney General asserts that the evidence supported a conclusion by the jury that there was in interruption in defendant's possession of the M1 rifle. We disagree. While there was evidence that (1) defendant discussed the possibility of selling the rifle, (2) also had a nine-millimeter weapon, and (3) was not the only one who touched the rifle, there was no evidence that the M1 actually left defendant's control and possession between the time of the USA Gas incident and the discovery of the rifle in the trunk of the green Saturn. He may have considered selling the M1 rifle; he may have also had another firearm; and other people may have touched the M1 rifle; but the only reasonable

37

inference is that defendant had possession of the M1 rifle from the time of the USA Gas incident until it was found in the trunk of the inoperative car at defendant's residence.

Since there was insufficient evidence to support a reasonable inference defendant relinquished and regained possession of the M1 rifle between the two relevant dates of possession, we must strike the convictions on counts 10 and 11, relating to defendant's possession of the rifle when it was discovered during the search of the green Saturn. We also strike the terms imposed and stayed for those two counts.

## DISPOSITION

As to count 5 and 6, the sentence is modified to stay the terms imposed under section 12022.5, subdivision (b), pursuant to section 12022.53, subdivision (f).

As to counts 2 and 6, the term imposed for each attempted deliberate and premeditated murder, exclusive of enhancements, is modified to life with the possibility of parole. (§§ 664, subd. (a); 3046, subd. (a).)

As to counts 10 and 11, each conviction is struck, acquittal is entered for each count, and the terms imposed for each count is struck.

As modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment consistent with this opinion and to send the amended abstract of judgment to the Department of Corrections and Rehabilitation.

                                         NICHOLSON      , Acting P. J.

We concur:


      MURRAY        , J.



      RENNER        , J.

38