Filed 1/6/23  P. v. McDonald CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CALVIN BENNETT MCDONALD III,<br><br>    Defendant and Appellant. | A164303<br><br>(Lake County<br>Case No. CR941389) |

Defendant Calvin Bennett McDonald III was found not guilty by reason of insanity of second degree murder (Pen. Code, § 187, subd. (a))[1] and assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)).  McDonald was committed to Napa State Hospital ("NSH") and, after approximately 18 months, filed a section 1026.2 petition to be placed on conditional release in an outpatient treatment and supervision program.  The court denied the section 1026.2 petition, finding that McDonald would continue to pose a danger to the health and safety of others upon conditional release.  We affirm.

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

According to the arrest report, McDonald made multiple calls to friends and family indicating he had killed someone. These included a call seeking assistance to bury a body, and a call informing his grandmother that he had stabbed someone to death who had tried to shoot him. McDonald resided in a trailer park community and the body of a neighboring resident was found in the vicinity.

McDonald was charged with murder. He was found not guilty by reason of insanity of second degree murder (§ 187, subd. (a)) and assault with force likely to great bodily injury (§ 245, subd. (a)(4)). In June 2018, he was committed to NSH.

In December 2019, McDonald filed the Petition for Transfer to Outpatient Treatment underlying this appeal and requested a hearing on his ability to be placed on conditional release pursuant to section 1026.2 (referred to as "conditional release petition"). The court directed the NSH Medical Director to evaluate McDonald and provide a written recommendation, pursuant to section 1026.2, subdivision (l) ("section 1026.2(l)"), regarding whether McDonald should be released to outpatient treatment or continue confinement in the state hospital.

In February 2020, while the petition was pending, McDonald was arrested by NSH police and charged with felony assault against another patient and multiple counts of resisting officers with force (§ 69). In September 2020, a jury found McDonald not guilty of the felony assault charge but convicted him of three felony counts of resisting officers by force or threat.

In March 2020, the state hospital issued its section 1026.2(l) report. The 41-page report, prepared by Dr. Paula Astalis, opined "to a reasonable

2

degree of medical/psychological certainty" that McDonald has a "mental defect, disease, or disorder and would be a danger to the health and safety of others, even while under supervision and treatment in the community." It identified the following three DSM-5[2] diagnoses: (1) narcissistic personality disorder; (2) other specified personality disorder, antisocial, borderline, and paranoid traits; and (3) moderate cannabis use disorder, in a controlled environment. The report's final recommendation stated: "[McDonald] continues to demonstrate a lack of insight into his symptoms of mental illness, benefits of engaging in treatment, and contributing factors to his instant offense. He has continued to demonstrate aggressive behaviors (verbal and physical), defiant behaviors, and minimal compliance with staff redirections or hospital rules in the past year. [He] demonstrates a pattern of minimizing or denying his symptoms and shifting responsibility for his behaviors onto staff or the institution. He continues to refuse to consider additional or alternative medications to address historical mood and psychotic symptoms. Additionally, he has not engaged in the developments of a Forensic Relapse Prevention Plan (FRPP), that would demonstrate awareness of factors contributing to his instant offense, potential triggers of future aggression or violence, or coping strategies to manage emotions and thoughts to contribute to violent behaviors." It was Dr. Astalis's opinion that McDonald should not be placed in a conditional release program to receive treatment on an outpatient basis at this time.

For a variety of reasons, the outpatient placement hearing on McDonald's conditional release petition was continued multiple times and ultimately took place in December 2021.

---

[2] DSM-5 refers to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

Dr. Kevin Kelly, a licensed psychologist retained by McDonald to examine him for potential release from the state hospital in connection with his conditional release petition, testified at the hearing on McDonald's behalf. Dr. Kelly had previously, in 2018, been appointed by the court to conduct a not guilty by reason of insanity examination of McDonald and to prepare a report regarding his mental state at the time of his commitment offense. At that time, Dr. Kelly had diagnosed McDonald with schizophrenia. In preparation for the hearing on the conditional release petition, Dr. Kelly had reviewed the state hospital's reports and periodic updates and met with McDonald once in 2020 and another time in 2021. Dr. Kelly spent a cumulative five and a half hours with McDonald over the course of three years.

According to Dr. Kelly, McDonald's mental status and condition had improved between 2018 and 2021, including a "marked difference" in demeanor. In his latest examinations, he did not exhibit paranoid ideation, delusions of grandeur, impulsivity, or anger, even though the state hospital described angry conduct in its report. He exhibited no impulsivity or anger, and the only episode of angry conduct had been McDonald's behavior in the wards, an apparent reference to the February 2020 incident. Moreover, based on the test he administered, Dr. Kelly found no evidence of mental health or personality disorder or psychosis. McDonald continued to suffer from anxiety disorder but was taking medication to address it.

Dr. Kelly agreed with the assessment in the state hospital report that McDonald was no longer suffering from schizophrenia. He also concurred with the portion of the hospital report stating " 'that no overt symptoms of psychosis, mania, or depression have been reported or observed,' " in McDonald, whose behavior reflected only mild anxiety and irritability. Nor

4

did he contest the hospital's finding that McDonald was "motivated to return to the community and reports a willingness to work" with a conditional release program.

Asked whether he believed McDonald posed a danger to himself or others if he were transferred to a conditional release program, Dr. Kelly stated, "I do not." He acknowledged that McDonald's underlying offense involved stabbing someone to death and that he had a "violent episode" with another inmate while at the state hospital. Nevertheless, Dr. Kelly opined as follows: "[T]he diagnosis of anxiety disorder and the present mental status of [McDonald] doesn't warrant treatment in a State hospital. He could be treated in the community with no more than ordinary risks, unless he were to become under the influence of a substance such as methamphetamine and unless he were to become psychotic for any reason, perhaps for lack of medication. Barring those conditions, he's not a risk to the community." Dr. Kelly believed McDonald to be an excellent candidate for conditional release.

On cross-examination, Dr. Kelly acknowledged his limited time with McDonald as compared to the time spent by state hospital medical staff. He agreed that someone who spent more time with a patient would have more of a basis for a diagnosis than someone who spent a few hours with them, but he added that even the hospital's diagnoses changed over time.

Dr. Kelly confirmed he was aware that a February 2020 report by Dr. Astalis included the following diagnoses: bipolar disorder; other specified personality disorder; narcissistic personality disorder with antisocial and paranoid traits; and a cannabis-related disorder. Dr. Kelly did not believe McDonald suffered from these disorders, as he saw no evidence of bipolar disorder or cannabis disorder and any cannabis disorder would be in

5

institutional remission.  Nor did he see any evidence in the reports underlying the diagnoses.

Dr. Kelly was also aware that the state hospital's March 2020 section 1026.2(l) report included diagnoses of narcissistic personality disorder; other specified personality disorder with antisocial, borderline, and paranoid traits; and moderate cannabis use disorder in a controlled environment.  Dr. Kelly obtained no evidence of these diagnoses in his own examination or the reports.

Dr. Kelly also reviewed a state hospital report from August 2021.  He acknowledged reviewing the summary of McDonald's rule violations which included noncompliance with lab work on urine and drug screens; noncompliance with staff redirection; violations of unit and hospital rules; refusal to meet with treatment teams; provocation of peers in crisis; verbal hostility and aggression towards staff and peers; threatening violence and professional grievances towards staff; and physical altercations with peers. Dr. Kelly understood that after McDonald was tried in Napa, he was initially placed in the state prison hospital and that such a placement was typically made for the safety of other inmates and staff.  He was familiar with the opinion of a state hospital doctor that McDonald was not ready to return to a general setting at the state hospital.

On redirect, Dr. Kelly noted that the authors of section 1062.2(l) reports typically have very limited contact with a patient and prepare the reports based on summarizing the accumulated history and notes from hospital staff.  Addressing the state hospital's reports of McDonald's obstreperous behavior, Dr. Kelly stated that McDonald asserted he was upholding and asserting his own rights as a patient while also educating his peers as to their rights and advocating for them, which was interpreted by

6

hospital staff as him being a busybody. Dr. Kelly noted that being an advocate for one's own rights was not a sign of any clinical disorder.

McDonald testified on his own behalf. He immediately addressed the February 2020 altercation with another hospital patient. McDonald explained that the other patient attempted to touch his genitals, so McDonald stopped him and established boundaries. Hospital staff and police intervened. However, moments later the other patient moved to attack him while the officers were busy. McDonald ran to grab the officers' attention but the other patient was closing in on him. The other patient took a swing at him, so McDonald proceeded to defend himself. He hit the other patient, who fell to the ground. As soon as his attacker fell, the officers intervened. McDonald placed his hands up and said he was defending himself. He never chased after the other patient. Following the incident, hospital staff or officers placed him in five-point restraints, which McDonald did not feel was justified under the circumstances. He flailed about but never struck any of the officers. He described his actions as "lawfully resisting." While restrained, his hands were strapped down to a bed as was his body from waist down. Staff refused to release one of his hands so he could use a urinal, as he believed they were required to do, and told him they would assist him by handling his genitals. McDonald became upset and made angry statements. For this episode, McDonald was charged with assault causing great bodily injury, but the jury found him not guilty of the charge. He was also charged with three counts of resisting officers with force and was convicted of those charges for which he was sentenced to sixteen months in jail.

McDonald had made several complaints about the treatment he and other patients received from hospital staff to the patients' rights advocate at

7

the hospital and felt "there was prohibitive retaliation because of this." Hospital staff told him they did not appreciate his complaints and warned him to stop complaining. McDonald further testified that he was compliant with his medications and would continue to take his medication if released, because his goal was to be "reintroduced into the community as a productive members of society." He also had family that would be able to provide him social and emotional support if released to community supervision.

The prosecution did not call any witnesses. The court asked if the prosecution intended to present evidence. The prosecutor stated, "Unless the Court—the Court's receiving the report." The court responded, "Are you asking me to take judicial notice of the 1026.1(l) report dated March 12th, 2020?" The prosecutor replied, "Yes." The court asked, "Any objection to that?" McDonald's attorney responded, "None available." The court stated it would take judicial notice of the specified report and asked, "Any further evidence?" The parties indicated there was none.

Following argument, the court took the matter under submission and later that day issued a ruling denying McDonald's petition. Citing the March 2020 section 1026.2(l) report, the court noted that McDonald had the following diagnoses: narcissistic personality disorder; other specified personality disorder; antisocial borderline and paranoid traits; and moderate cannabis use disorder in a controlled environment. The court observed that Dr. Kelly, on the other hand, opined the defendant did not have any of these diagnoses but such opinion was based primarily on limited interactions with McDonald and the administration of a single test. The court also considered the reports from the state hospital. The court explained: "At this hearing, the defendant has the burden of proof by a preponderance of the evidence. The defendant has failed to meet his burden to prove that he does not suffer from

a mental defect, disease, or disorder. The Court finds the opinions contained in the 1026.2 subdivision (l) report regarding the . . . diagnoses and the reasons, therefore, are more convincing than those of Dr. Kelly."

The court found McDonald "would be a danger to the health and safety of others" if released. The court cited several factors for this conclusion: "several acts of aggression towards staff and peers during the year prior to the report were documented; the number of these acts averaged to more than two per month; he has consistently refused medication and directions from staff; the defendant has not articulated any plans for managing his mental health; he has a lack of insight into his mental health; he has a long history of aggressive and violent behavior which he continues to deny and minimize or rationalize." The court stated McDonald had done just that when he testified at his hearing. In concluding, the court found by a preponderance of evidence that McDonald would be a danger to the health and safety of others due to mental defect, disease, or disorder if under supervision and treatment in the community. This appeal followed.

## DISCUSSION

### A. Denial of Conditional Release Petition

McDonald argues the trial court erred in denying the conditional release petition. We disagree.

#### 1. Applicable Law

A defendant found not guilty of a crime by reason of insanity may be committed to the Department of State Hospitals. (§ 1026.) "The purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness." (*Jones v. United States* (1983) 463 U.S. 354, 368.)

9

There are three ways for one confined in a state hospital due to a not guilty by reason of insanity verdict to be released from the hospital: "(1) upon restoration of sanity pursuant to the provisions of section 1026.2, (2) upon expiration of the maximum term of commitment under section 1026.5, or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq." (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 (*Sword*), citations omitted; § 1026.1, subd(a)–(c).) The third option requires the recommendation of the director of the state hospital in which a defendant is committed. (*Sword*, at p. 620.) If a defendant initiates his or her own release without the approval of the director of the state hospital or their treatment facility, as is the case here, the defendant falls under the first option and must show restoration of sanity pursuant to section 1026.2. (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432 (*Dobson*).)

A petition for restoration of sanity pursuant to section 1026.2 involves a two-step process. (*Dobson*, *supra*, 161 Cal.App.4th at p. 1432.) "The first step in the release process requires the defendant, who has filed a release application, to demonstrate at a *hearing* that he or she will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community.' " (*People v. Soiu* (2003) 106 Cal.App.4th 1191, 1196 (*Soiu*).) The defendant has the burden of proof by a preponderance of the evidence. (*Dobson*, *supra*, 161 Cal.App.4th at p. 1433; § 1026.2, subd. (k).) After a defendant files a section 1026.2 petition, it is the court's responsibility "to obtain a recommendation regarding the appropriateness of conditional release from the person in charge of the defendant's treatment." (*People v. Endsley* (2016) 248 Cal.App.4th 110, 115.) Section 1026.2(l) requires the court to obtain the recommendation before it takes any action on a section 1026.2 petition. (*Id*. at p. 118.) "If the court

finds such at the hearing, the defendant is then placed in 'an appropriate forensic conditional release program for one year.' [Citation.] This is commonly called the outpatient placement hearing." (*Soiu, supra,* 106 Cal.App.4th at p.1196.) " ' "Outpatient status is not a privilege given the [petitioner] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [petitioner] and cause no undue hazard to the community." ' " (*Dobson,* at p. 1433.)

"The second step in the release process, often referred to as the restoration of sanity trial, normally occurs one year after the defendant has been placed in an outpatient program. Typically after one year, the court holds a *trial* to determine whether the defendant's sanity has been restored." (*Soiu, supra,* 106 Cal.App.4th at p. 1196.)

### 2.    Standard of Review

The denial of a petition for conditional release under section 1026.2 is reviewed for an abuse of discretion. (See *Dobson, supra,* 161 Cal.App.4th at p. 1433; *People v. Bartsch* (2008) 167 Cal.App.4th 896, 900.) Under this standard, we defer to the decision of the trial court unless the trial court " 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Jackson* (1992) 10 Cal.App.4th 13, 19.) An abuse of discretion exists when the trial court's "factual findings critical to its decision find no support in the evidence" (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998), but not when the defendant merely shows " ' "facts . . . afford[ing] an opportunity for a difference of opinion" ' " (*Sword, supra,* 29 Cal.App.4th at p. 626).

11

While McDonald argues that a substantial evidence standard applies on rulings for conditional release, he provides no relevant authority in support of this position.[3] He has therefore forfeited appellate review of the issue (*People v. Camel* (2017) 8 Cal.App.5th 989, 999) and we shall apply the abuse of discretion standard.[4]

### 3.    Analysis

McDonald cannot demonstrate that the trial court abused its discretion in denying his conditional release petition. To be eligible for conditional release, it was McDonald's burden to prove by a preponderance of the evidence that he would not be a danger to the health and safety of others due to mental defect, disease, or disorder while under supervision and treatment in the community. (§ 1026.2.)

However, there was evidence that McDonald suffered from mental defects or disorders. The state hospital's March 2020 section 1026.2(l) report stated that McDonald was suffering from several mental defects or disorders. State hospital doctors diagnosed McDonald with narcissistic personality disorder; other specified personality disorder, antisocial, borderline, and

---

[3]    The only case McDonald cites in his opening brief is *People v. Perez* (2022) 78 Cal.App.5th 192, which simply includes a recitation of the substantial evidence standard itself. (See *id*. at p. 203 [applying substantial evidence standard to support attempted murder conviction].) In his reply brief, McDonald cites to *Malloy v. Superior Court of Los Angeles County* (2022) 83 Cal.App.5th 543, for the contention that trial court factual findings are reviewed for substantial evidence while application of law to facts is reversible only if arbitrary and capricious. As *Malloy* reviewed an order on a motion to transfer venue, and did not involve a petition for conditional release, it is not relevant. (*Id*. at p. 551.)

[4]    Even under the substantial evidence standard, the evidence presented to the trial court, which includes the section 1026.2(l) report, is more than sufficient to support the trial court's denial of McDonald's petition for conditional release.

paranoid traits; and moderate cannabis use disorder in a controlled environment. The report provided a narrative discussion of and supporting evidence for each diagnosis. While Dr. Kelly disputed these diagnoses, his difference of opinion did not render the court's finding an abuse of discretion. (*Sword, supra,* 29 Cal.App.4th at p. 626.) The court noted that Dr. Kelly's assessment was less persuasive because it was based on limited interactions, whereas the record indicated McDonald had been under the supervision and care of state hospital staff for many months by the time the hospital report was completed. It was neither arbitrary nor unreasonable for the court to conclude McDonald continued to suffer from mental defects or disorders based on the assessment of hospital doctors.

There was also evidence that McDonald would be a danger to the health and safety of others due to his diagnoses if he were under supervision and treatment in the community. Again, the state hospital's March 2020 section 1026.2(l) report stated that McDonald "would be a danger to the health and safety of others, even while under supervision and treatment in the community." The report explained that McDonald "has had numerous behavioral incidents over the course of his hospitalization, ranging from noncompliance with lab work or urine drug screens to noncompliance with staff redirection, verbal hostility and aggression toward staff and peers, provoking peers when in crisis, and physical altercations with peers." Over five pages, the report described dozens of acts of aggression and examples of noncompliance from March 2019 through February 2020. During the February 2020 incident about which McDonald testified, he had knocked the patient who allegedly attempted to touch him unconscious, requiring surgery for the significant facial and jaw injuries that resulted. When McDonald was restrained, he was reported to have yelled at staff: "I'm gonna remember this

and come after you once I get out of these restraints. I'm going to break your fucking nose you little bitch. Just be glad I'm tied down right now." With respect to this incident Dr. Astalis observed: "[McDonald's] violent assault on a peer . . . in the presence of unit staff and hospital police, demonstrated a continued presence of violent ideation, low stress tolerance, impulsivity, and inability to consider consequences to self or other. These factors indicate a continued heightened risk of danger to others in an inpatient setting. Were he to be released to the community without strict supervision and monitoring, he would represent a HIGH risk of danger to others."

The section 1026.2(l) report also contained the findings of a conditional release program clinician who opined that McDonald was not ready for community outpatient treatment. She believed McDonald needed to develop a better understanding of his triggers for and warning signs of psychiatric decompensation and would benefit from diversifying his coping skills. He still needed to learn to control his emotional reactions in a healthy and nonviolent way, as well as gain better insight into his mental illness and potential for dangerousness in connection with his symptoms. The clinician similarly concluded that McDonald "continues to represent a significant risk in the community, and therefore cannot be safely or effectively managed by [a conditional release program] at this time."

McDonald's own testimony also supported the court's finding. Even if we were to disregard his claimed act of self-defense against his fellow inmate, McDonald exhibited aggressive behavior towards the police officers who attempted to restrain him following the episode such that a jury found him guilty of three separate counts of resisting officers with force. Even Dr. Kelly acknowledged that for a certain period McDonald had to be kept in the state prison hospital, which is usually the placement for those who presented

14

safety issues and would not be able to be constrained sufficiently within the state hospital to ensure the safety of other inmates and staff.  Notably, all of this occurred during his commitment at NSH, after he had filed his conditional release petition.

On this record, we cannot say that the court abused its discretion by concluding McDonald failed to demonstrate his suitability for conditional release. And we are not persuaded by McDonald's contentions on appeal that there was no evidence for the court to make its findings because "all of that information came from the [March 2020 section 1026.2(l)] report [which] was not admitted into evidence," the report's contents were not judicially noticeable, or that it contained inadmissible hearsay.

As an initial matter, the section 1026.2(l) report was clearly in evidence.  While the prosecutor never formally introduced the report into evidence, the court took judicial notice of the report without any objection from McDonald.  "It is well recognized that the purpose of judicial notice is to expedite the production and introduction of otherwise admissible evidence." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578.)  After the court took judicial notice of the report, the court's "[a]ny further evidence?" inquiry underlined that the court considered the report to be in evidence.  In addition, throughout the entire outpatient placement hearing, the parties repeatedly referenced the report.  McDonald's witness, Dr. Kelly, stated he had reviewed the state reports and was asked repeatedly about the state hospital's assessment from the section 1026.2(l) report during direct examination.  McDonald's counsel relied on the report in closing argument, stating that parts of the report discuss "a lot of [McDonald's] mental illness being in remission."  The court also relied on the report in explaining its

15

decision denying McDonald's petition. Under these circumstances, it was proper evidence considered by the court in reaching its decision.

Moreover, McDonald's evidentiary objections to the court's consideration of the section 1026.2(l) report have been forfeited. By failing to assert any objection to the report at any point during the outpatient placement hearing – even though it was referenced repeatedly throughout the hearing – McDonald has forfeited any contention on appeal that the report was erroneously considered or relied upon as evidence. (Evid. Code, § 353, subd. (a) [no reversal on appeal absent timely and specific objection to erroneous admission of evidence in trial court]; *People v. Landry* (2016) 2 Cal.5th 52, 86 [failure to object in trial court to erroneous admission of evidence based on grounds raised on appeal forfeits claim of error].) He also failed to raise any objection to the trial court taking judicial notice of the hospital's report, including its contents, or using judicial notice in the manner sought. Such objections to the court's judicial notice have also been forfeited. (Evid. Code, § 353, subd. (a); *Younan v. Caruso* (1996) 51 Cal.App.4th 401, 406, fn. 3 ["[F]ailure to timely object to the propriety of judicial notice . . . is deemed a waiver of that objection"].) Likewise, he lodged no hearsay objections against the report in the trial court proceeding, which also forfeits his hearsay arguments on appeal. (*People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of . . . hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].) The court expressly asked if there were objections to taking judicial notice of the report but McDonald asserted no objection. At the point the court judicially noticed the report and asked if there was any "further evidence," it was clear that the court saw the report as evidence. When the court relied on the substance of

16

the report in explaining its ruling, it was abundantly clear that the court considered the report in evidence, yet still no objection from McDonald came.

## B.    Ineffective Assistance of Counsel

McDonald argues that to the extent his evidentiary claims are forfeited, his counsel was ineffective for failing to object to the trial court taking judicial notice of the section 1026.2(l) report and by failing to assert hearsay objections to the report.  Again, we disagree.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms."  [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."  [Citation.]  If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."  [Citations.]  If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' "  (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

Here, McDonald has not overcome the presumption that his trial counsel's actions fell within the wide range of reasonable professional competence and were matters of sound trial strategies.  "[A] mere failure to

object to evidence seldom establishes counsel's incompetence." (*People v. Malone* (1988) 47 Cal.3d 1, 33.) " 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. . . . A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) In this case, McDonald's trial counsel may not have lodged such objections to the report because he used the report in examining Dr. Kelly and in his own closing argument. In his direct examination, Dr. Kelly agreed with several aspects of the report, including the state hospital's assessment that McDonald was no longer suffering from schizophrenia and was no longer exhibiting signs of psychosis, mania, or depression. Relatedly, trial counsel relied on the report to argue in closing argument that much of McDonald's mental illness was in remission. (See, e.g., *People v. Kelly* (1992) 1 Cal.4th 495, 520 [trial counsel not ineffective for not objecting to admission of client's confession which was harmful in some respects but which "competent counsel could reasonably believe . . . helped the defense in other respects"].) Further, counsel may also not have objected to the report to avoid having the prosecutor call multiple witnesses, including Dr. Astalis and the conditional release program clinician whose testimony may have been even more damaging than the report. Choosing to permit admission of a report rather than risking in-court testimony is an "informed tactical decision." (Cf. *In re Angelia P.* (1981) 28 Cal.3d 908, 926–927 ["The failure of counsel to object did not reflect any lack of competence, because, faced with his adversary's request for the court to take judicial notice, counsel could well have concluded that it was better to permit admission of the report rather than to risk presentation of in-court testimony from other witnesses whose adverse testimony may have been more damaging. This would have been an informed tactical decision."].)

18

Since we cannot conclude that there can be no satisfactory explanation for counsel's decision to not assert any evidentiary objections to the section 1026.2(l) report, we must reject McDonald's ineffective assistance claim.

## DISPOSITION

The trial court's order denying McDonald's petition for conditional release is affirmed.

                                            _____

                                            Petrou, J.

WE CONCUR:


_____

Tucher P.J.


_____

Rodríguez, J.

A164303/*People v. McDonald*