Filed 2/22/23  P. v. Vidales CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C088685 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF153593) |
| v. | [OPINION ON TRANSFER] |
| BRANDON RYAN VIDALES, | |
| Defendant and Appellant. | |

In a trial to the court, defendant Brandon Ryan Vidales was found guilty of several weapon and drug offenses related to his gang membership.  On appeal, he requests we review the sealed affidavit supporting the search warrant, which includes the evidence giving rise to his convictions, for discoverable material that would assist him in a motion to suppress.  He further argues he did not knowingly waive his right to a jury trial and that insufficient evidence established he offered to sell a machine gun and three large-capacity magazines and that he committed all the offenses for the benefit of a criminal street gang.

1

We initially agreed the evidence failed to establish defendant acted to benefit his gang under former Penal Code[1] section 186.22 when possessing methamphetamine for sale, possessing a loaded firearm in public, and possessing a firearm while also possessing methamphetamine. We concluded, however, that sufficient evidence supported defendant's remaining gang enhancement under the former gang enhancement statute. We disagreed with defendant on his remaining contentions and reversed the judgment accordingly. (*People v. Vidales* (Feb. 23, 2021, C088685) [nonpub. opn.].) Our Supreme Court granted review and transferred the matter back to us to reconsider in light of *People v. Renteria* (2022) 13 Cal.5th 951 and Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 4).

Upon transfer, the parties filed supplemental briefs agreeing defendant's remaining gang enhancements must be reversed because of amendments to the gang enhancement statute (§ 186.22) enacted by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 4). While we concluded there was sufficient evidence supporting the remaining gang enhancements under the *former* gang enhancement statute, we agree there is insufficient evidence under the *current* gang enhancement statute. Accordingly, we vacate defendant's remaining gang enhancements and afford the prosecution the opportunity to retry defendant upon remand for the remaining gang enhancements under current law. (See *People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

FACTUAL AND PROCEDURAL BACKGROUND

On June 25, 2015, Woodland Police Officers executed a search warrant of defendant's parents' home, his own home, and his car, finding several incriminating items. At his parents' home, in a gun safe, officers found a black AR-15 rifle with an

---

[1] Undesignated section references are to the Penal Code.

2

eight-inch barrel and an after-market device in the triggering mechanism allowing the rifle to fire as a fully automatic weapon. The firearm did not have any manufacturing marks or a serial number. Because the weapon lacked markings, a gun expert with the Yolo County District Attorney's Office believed the weapon was purchased 80 percent complete, basically consisting of only the lower portion of the weapon. A person then manufactured the remainder of the weapon by mounting an eight-inch barrel on the lower portion and drilling a space for a trigger mechanism the person also installed. There was no evidence in defendant's parents' home indicating the AR-15 rifle was manufactured there. Also in the safe, and capable of fitting into the AR-15 rifle, was a loaded large-capacity magazine holding 100 rounds. There was also a black canister containing 250 rounds of "steel core ammunition" for the AR-15 rifle.

Officers also seized from the safe a semiautomatic .45-caliber handgun. This gun was not registered to defendant or his father. Attached to the top of the handgun's barrel was a sighting device, while attached to the bottom was a flashlight. Officers recovered 50 rounds of .45-caliber ammunition compatible with this handgun.

Officers further seized from the safe a semiautomatic .40-caliber handgun with the serial number removed. A serial number is commonly removed to hide the identity of a weapon. Thirteen rounds of loose ammunition as well as a loaded 29-round magazine compatible with the .40-caliber handgun were also found in the safe.

Additionally, officers found a loaded large-capacity magazine for a nine-millimeter handgun with 20 rounds of live ammunition in the safe, as well as three "speed loaders," which are designed to assist in rapidly reloading revolver-style handguns, each containing six rounds of live ammunition. Finally, as it pertains to weapons and ammunition, there were 260 rounds of .38-caliber ammunition capable of fitting into a revolver.

Also in the safe, was a red folder appearing to belong to defendant that contained drawings, news articles, and various other documents from over the years. The drawings

included gang indicia, while the news articles pertained to crimes committed by local Norteño gang members. Defendant's mother testified she collected these items over the course of the last 16 years to remind defendant of the path she did not want him to take. Officers also recovered a large quantity of money and what defendant's mother testified was defendant's tax return. This money was given back to defendant following the civil forfeiture process.

At defendant's home, officers found a digital scale on the refrigerator with remnants of a white substance. In the closet near the front door, officers also found a bag containing marijuana and numerous empty bags commonly used to package drugs. In what appeared to be a child's room, there were envelopes with the names of known former gang members. In the master bedroom, officers found a red hat with the letter W and a red jacket with the letter B, both appearing to be gang related.

In defendant's car, officers found a loaded .357-caliber revolver and just over 21 grams of methamphetamine, as well as defendant's cell phone. Upon a later search of defendant's cell phone, officers found several photos and videos indicating defendant belonged to the largest criminal street gang in Woodland—the Varrio Bosque Norteño subset of the Norteño criminal street gang.[2] In the photos and videos, defendant can be seen with several known Varrio Bosque members, all wearing gang clothing and displaying gang signs and tattoos. His phone contained several other photos of known Varrio Bosque members. Defendant also had two gang-related tattoos, including "Nor" and "Cal" on the back of each calf, and a pair of dice inside of one calf—one die with one dot and the other with four to signify the number 14, a number associated with the Norteño criminal street gang.

---

[2] The parties stipulated the Varrio Bosque Norteño gang was a subset of the Norteño criminal street gang and constituted a criminal street gang for the purposes of former section 186.22.

Defendant also communicated with several known gang members on his phone through text messages and social media. For example, defendant took a screenshot of a conversation he had with a known Varrio Bosque member, in which the known member explained he cheated the legal system to get probation instead of prison and any statements to the contrary were gossip because he was loyal to the gang "till the day [he] die[s]." In another screenshot of a social media conversation with known Varrio Bosque members, defendant described himself as "#WARREADY" and stated, "Me and my three brothers will tear this town down and anybody who wants it. #fullys with 100 round drums, #Glock with 30 sticks, 45 with extended clips, tre pounds that knock your whole family down on #God . . . , yall don't want to pistol play."

In yet another conversation, this time with an unknown individual, defendant appeared to be discussing an investigation the Varrio Bosque were conducting into an affiliated member who testified against active gang members in another jurisdiction. The conversation appeared to pertain to collecting evidence to justify an assault against the affiliate; however, the "paperwork" had not come through the appropriate channels to justify the hit.

The gang expert testified the primary criminal activities of the Varrio Bosque were crimes of violence, drug sales, assaults, and possession and sale of illegal firearms. It is common in gangs, as well as this one, for guns to be passed around from one gang member to another. With some exception, gang members who are allowed to possess firearms will commonly hold them for the gang and then relinquish possession to other members upon request.

There were several photos and videos of guns found on defendant's phone, many of which appeared to be of weapons seized during the search. One such photo showed two known Varrio Bosque gang members, one of whom was holding the revolver recovered from defendant's car with the sighting device recovered from the safe attached to it. Another photo depicted three short-barrel, AR-15 rifles, similar to one found in the

5

safe, with 40-round magazines and foregrips positioned near a placard stating "City of Trees," which is sometimes used by the Varrio Bosque to signify their gang and local affiliation. Also, on a video taken from defendant's cell phone showing a weapon and ammunition later seized by police, defendant can be seen with several jars of marijuana and packages of methamphetamine prepared for sale.[3]

During a September 3, 2014, conversation on Facebook with an unknown individual, defendant said, "I got a plug on something better, but it is pricey." Then continued, "Mini AR-15s, fully auto with stock that pulls straight out, four grip laser, and hundred round drums[4] with all American parts, no serial numbers. Everything illegal. It's pricey, though. $1,800 to two grand." When the individual expressed hesitation, defendant justified the price because "the guy who builds them takes a risk putting them together, and they are fully auto." Further, "there are no serial numbers." The unknown individual appeared to want to purchase a legal weapon, to which defendant responded, "I don't do the legal stuff, but do your thing my dude."

On March 14, 2015, defendant texted with multiple individuals, some of whom were known Varrio Bosque members. The messages appeared to be attempts at rallying Varrio Bosque members to fight at a park or at someone's home about a conflict within the gang. Defendant could not participate because he was watching his children, and nothing seemed to have come of the conversation. During the conversation, however, defendant texted he would "bring the toy," referring to a gun, and there were other references to weapons and attack strategy.

---

**3**    Further evidence of defendant's drug sale activity was found in a Facebook conversation with an unknown individual who greeted defendant with language commonly used among gang members and asked "how much for 4oz." A photo was also recovered from defendant's phone showing a large quantity of pills and a bottle of codeine syrup with the words "Who need there FIX $$$" typed across it.

**4**    A "drum" is a type of magazine for a firearm.

6

On April 1, 2015, defendant took a screenshot with his cell phone of a photograph of an AR-15 rifle with a 100-round magazine attached to it. Also, in the photo were a subcompact handgun with a magazine sticking out of it, along with other magazines, two of which held over 20 rounds, and a separate 50 round magazine. Two other firearms and other ammunition appeared in the photo as well. Written over the photograph in a typewritten banner appear the words "Everything goin[,] hit me." The cell phone expert testified he was able to find the photo on defendant's phone without the added banner of text. It appeared as a thumbnail, meaning the image was downloaded from an external source or the product of a screenshot from that source. When an image appears as a thumbnail, however, it does not mean the image was not also taken on that phone. It is possible to download or take an image, add graphics and text, and then take a screenshot of the resulting image. While the cell phone download provided a lot of information, it did not recover everything, leaving some doubt about where some of the images came from or from where the images were sent. No testimony established defendant sent the image in either of its forms to others. The pistols in the photo were not recovered, but a similar AR-15 rifle, the extended magazines, and other ammunition were recovered from the safe at defendant's parents' home.

On June 16, 2015, a known Varrio Bosque gang member texted defendant asking what guns he possessed. Defendant responded, "H.k. 45 two tone with a sleeve that goes over the barrel its got a green beam with flash light and like a x target thing u look into. [¶] That glock 40 with the 30 and a beam . . . [¶] . . . And two 357s." Around this time, which was also when officers searched defendant's property, three other validated Varrio Bosque gang members in the Woodland area were caught selling short-barrel, fully automatic AR-15 rifles to different police agencies.

The gang expert testified that possession of fully automatic weapons and large-capacity magazines would benefit a criminal street gang because it contributed to the intimidation the gang exerted to accomplish its crimes. Weapons, especially illegal

7

weapons, add to the intimidation targeted toward rival gangs and the community, accomplishing fear. Guns also garner respect for individuals within the gang by elevating that individual to a higher status.

Based on this evidence, the court found defendant guilty of "selling or manufacturing or converting a firearm into a machine gun," possessing a controlled substance for sale, four counts of being a felon in possession of a firearm, three counts of selling large-capacity magazines, possessing a controlled substance while armed, and carrying a loaded firearm in public. The court also found the gang enhancements attached to each count true and the firearm enhancement attached to defendant's possession of a controlled substance for sale conviction true. The court also found defendant had previously been convicted of a felony within the meaning of the three strikes law but struck the prior serious felony conviction enhancement based on the same conviction. The court sentenced defendant to an aggregate term of 18 years 4 months on this case.

Defendant appeals.

DISCUSSION

I

*There Is No Discoverable Material Contained In The Warrant Affidavit*

Defendant requests we independently review the search warrant and accompanying sealed affidavit for discoverable evidence that may support a motion to suppress. The People concede defendant is entitled to this review.

"When a defendant seeks to quash or traverse a warrant where a portion of the supporting affidavit has been sealed, the relevant materials are to be made available for in camera review by the trial court." (*People v. Galland* (2008) 45 Cal.4th 354, 364; accord, *People v. Hobbs* (1994) 7 Cal.4th 948, 963 (*Hobbs*); see Evid. Code, § 915, subd. (b) [providing for in camera review of confidential information].) "The court should determine first whether there are sufficient grounds for maintaining the

8

confidentiality of the informant's identity. If so, the court should then determine whether the sealing of the affidavit (or any portion thereof) 'is necessary to avoid revealing the informant's identity.' " (*Galland*, at p. 364; accord, *Hobbs*, at p. 972.)

Once the trial court determines the affidavit was properly sealed, it "should proceed to determine 'whether, under the "totality of the circumstances" presented in the search warrant affidavit and the oral testimony, if any, presented to the magistrate, there was "a fair probability" that contraband or evidence of a crime would be found in the place searched pursuant to the warrant' (if the defendant has moved to quash the warrant) or 'whether the defendant's general allegations of material misrepresentations or omissions are supported by the public and sealed portions of the search warrant affidavit, including any testimony offered at the in camera hearing' (if the defendant has moved to traverse the warrant)." (*People v. Galland*, *supra*, 45 Cal.4th at p. 364, quoting *Hobbs*, *supra*, 7 Cal.4th at pp. 975, 974.) We independently review the record and sealed portion of the affidavit to determine whether there was a "reasonable probability" defendant could prevail on his motion to traverse or quash the search warrant. (*Hobbs*, at p. 975.)

We have reviewed the entire record, including the sealed search warrant affidavit presented to the trial court in camera. We conclude the trial court did not err in refusing to unseal the sealed affidavit providing probable cause for issuance of the search warrant because disclosure of its contents would reveal the identity of the confidential informant. (*Hobbs*, *supra*, 7 Cal.4th at p. 971; *People v. Camel* (2017) 8 Cal.App.5th 989, 1009 [trial court did not err in refusing to unseal entire search warrant affidavit or in determining which portions had to remain under seal to protect confidentiality of confidential informants].)

Additionally, there is nothing in the sealed search warrant affidavit to suggest the affiant made any misrepresentations or omissions in applying for the search warrant. (*Hobbs*, *supra*, 7 Cal.4th at p. 977.) The sealed affidavit further provided an adequate basis to establish the informant's reliability, and the information provided by the

9

confidential informant supported the magistrate's finding of probable cause for issuance of the search warrant. (*Id.* at p. 975.) The trial court properly denied the motions to unseal the search warrant affidavit.

II

*Defendant Intelligently Waived His Jury Trial Right*

Defendant contends the record lacks any showing he intelligently waived his right to a jury trial, requiring reversal. We disagree.

A

*Background*

At the start of the trial readiness conference, both the prosecution and defense indicated they had decided to waive a jury trial. The court asked defendant whether he understood that the court would try his case and defendant answered in the affirmative. The court then accepted defendant's waiver of his trial right.

At sentencing, defendant asked to be heard regarding his counsel's ineffectiveness. He explained he "never wanted to have a bench trial, but [his attorney] pressured, conned, and persuaded [him] into doing so by falsely advising [him] that it [wa]s [his only] option of beating some of [his] charges, and that [counsel and the court] ha[d] a great rapport and relationship, so that w[ould] play a huge part in [his] trial. [¶] [His attorney] also explained to [defendant] and informed [him] that the difference between a bench trial and jury trial is that when you have a jury trial, the jury can convict [him] on their feelings and emotions while a bench trial with the judge has to uphold the law and can only convict [him] on evidence and facts. This [wa]s all propaganda, and [he] was misled into believing that [counsel] had [his] best interest at hand." Defendant listed several other problems he had with his attorney's representation not pertinent to his jury trial waiver.

10

Given defendant's statements, the court scheduled a *Marsden*[5] hearing. At the *Marsden* hearing, defense counsel responded to defendant's concerns. As it pertained to defendant's jury trial waiver, trial counsel stated, "I did not feel I pressured [defendant], though, I could see how he would feel pressure. I did advise him on that. Interestingly enough, prior counsel, according to his mother, had also advised him to waive jury in this. The reason was that the sheer number of guns and the connection, however tenuous, to gangs I felt was going to make such an impression on the jury that [it] would be -- have a tendency to lose focus and be very, very prejudic[ial]. I felt that that was going to be lessened with a court trial. May have been wrong, but that was my thinking on it and that's why we did it. [¶] As far as his statement that I told him I had a special relationship with you, I never said that. And one of the interesting things that you may remember, but we did this at sidebar, both [the prosecutor] and I indicated we would only waive a jury if you handled it. Both sides wanted you to handle it."

The court denied defendant's *Marsden* motion and motion for a new trial based on ineffective assistance of counsel, to the extent defendant moved for such relief.[6]

B

*The Record Demonstrates Defendant Was*

*Informed Of The Meaning Of A Jury Trial*

A criminal defendant has the constitutional right to a jury trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*).) The defendant may waive his constitutional right to a jury trial, provided

---

**5**     *People v. Marsden* (1970) 2 Cal.3d 118.

**6**     Defendant does not argue on appeal his waiver was involuntary, as his trial court argument implied. Indeed, the trial court accepted counsel's version of events. What remains from defendant's allegations is that defendant discussed with his counsel the pros and cons of a court trial compared to a jury trial, and he failed to see how the reasons underpinning those discussions benefited him at trial.

11

the waiver is " 'knowing and intelligent, that is, " ' "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it," ' " as well as voluntary " ' "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." ' " ' [Citation.] '[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case.' " (*Sivongxxay*, at p. 166.) Our Supreme Court has "persistently declined to mandate any specific admonitions describing aspects of the jury trial right." (*People v. Daniels* (2017) 3 Cal.5th 961, 992; see *Sivongxxay*, at p. 167 ["Our precedent has not mandated any specific method for determining whether a defendant has made a knowing and intelligent waiver of a jury trial in favor of a bench trial"].)

In *Sivongxxay*, our Supreme Court provided guidance for trial courts taking jury trial waivers. The guidance included "that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.)

Our Supreme Court also recommended "the trial judge take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails. A trial judge may do so in any number of ways -- among them, by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived. Ultimately, a court must consider the defendant's individual circumstances and exercise judgment in

12

deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently." (*Sivongxxay*, *supra*, 3 Cal.5th at pp. 169-170.) The court was careful to emphasize that this "guidance is not intended to limit trial courts to a narrow or rigid colloquy." (*Id*. at p. 170.)

The test of a valid waiver turns on whether the record affirmatively shows that the waiver is voluntary and intelligent under the totality of the circumstances. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167.) We independently examine the record to determine whether this standard has been met. (*People v. Burgener* (2009) 46 Cal.4th 231, 241.)

Defendant relies on *Jones* and *Blanchett.* (*People v. Jones* (2018) 26 Cal.App.5th 420; *People v. Blancett* (2017) 15 Cal.App.5th 1200.) In these cases, the records did not affirmatively show the defendants' jury waivers were intelligent and voluntary. (*Jones*, at pp. 435-437; *Blancett*, at pp. 1204-1207.) In both cases (1) the waiver colloquies were limited to asking the defendants whether they agreed to have, or were "okay" with having, their cases decided by the court rather than a jury; (2) the defendants were not advised of any of the other "significant attributes" or basic "mechanics" of a jury trial; and (3) the trial courts did not ask the defendants whether they had had sufficient opportunities to discuss their jury waivers with their counsel. (*Jones*, at pp. 428, 434, 437; see *Blancett*, at pp. 1203, 1205-1206.) Additionally, the defendant in *Jones* had no prior experience with the criminal justice system. (*Jones*, at p. 437.) Similarly, the record in *Blancett* did not show the defendant, a mentally disordered offender facing his first civil commitment proceeding, was "legally sophisticated" or knew he was entitled to a jury trial. (*Blancett*, at p. 1206.)

We agree with defendant to the extent he argues the trial court's colloquy was sparse and did not inform him of the mechanics of a jury trial. The record as a whole, however, demonstrates defendant voluntarily and knowingly waived his right to a jury trial. When describing to the court his counsel's inadequacies, defendant indicated he had discussed the pros and cons of choosing a court trial with a judge, over a jury trial.

13

Specifically, he explained he understood the judge would likely view the evidence in the context of the law, while a jury would likely view it with bias and emotion. We can understand this to mean defendant discussed with his attorney what a jury trial consisted of and why his case would be better suited for a court trial, having his case heard by a judge alone. Thus, while the waiver colloquy may not have informed defendant of the basic mechanisms of a jury trial and what that entailed, the record demonstrates his attorney did.

Defendant disagrees, arguing we cannot infer he was adequately informed of his jury trial right simply because he was represented by counsel. We do not infer defendant was adequately informed because he was represented, we infer he was adequately informed because defendant said he spoke to his attorney about the tactical implications of choosing a court trial over a jury trial. This provides the evidence lacking in *Jones* and *Blancett*. (See *People v. Jones*, *supra*, 26 Cal.App.5th at pp. 435-437; see also *People v. Blancett*, *supra*, 15 Cal.App.5th at pp. 1204-1207.) While counsel did not state on the record he explained the basic mechanics of a jury trial to defendant, we can infer a tactical discussion as described by defendant would also include those topics.

Further, while arguing to the court his counsel was inadequate, defendant displayed a relatively high level of knowledge regarding the legal system. He cited specific code sections to the court as well as long-standing legal principles of due process and the right to effective counsel. Defendant also indicated he was heavily involved in the strategy of his case by suggesting witnesses, including expert witnesses, and motions. This was also not defendant's first encounter with the legal system, having been convicted of a prior strike-qualifying felony conviction. The whole of the evidence suggests defendant had a level of legal sophistication such that he knew what the jury right entailed. Accordingly, the record reflects defendant voluntarily and intelligently waived his right to a jury trial.

14

## III

### *Sufficiency Of The Evidence*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same where the prosecution relies primarily on circumstantial evidence. (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.) " 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The sufficiency of the evidence to support an enhancement is reviewed using the same standard applied to a conviction. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

### A

### *Sufficient Evidence Established Defendant Offered To*
### *Sell A Machine Gun And Its Compatible Large-Capacity Magazine*

Defendant was convicted of offering to sell a machine gun (§ 32625, subd. (b)), as well as three violations of section 32310, which includes among its prohibitions the offering for sale of a large-capacity magazine. He argues the evidence does not support the theory he offered to sell the prohibited items. We agree in part.

The parties agree the only evidence potentially showing defendant offered to sell a machine gun and three large-capacity magazines was the image from his cell phone with the phrase "Everything goin[,] hit me" and the Facebook conversation with an unknown

individual in which defendant indicated he had a "plug" on where to buy a machine gun with a 100-round magazine.

We agree with defendant that the photo of multiple firearms and three large-capacity magazines with the phrase "Everything goin[,] hit me" is insufficient to show he offered these items for sale. The evidence showed defendant downloaded the unedited image from an external source and took a screenshot of the image as edited. The expert explained that although the unedited image appeared on defendant's phone through an external source, it could have also been taken on defendant's phone. It is also possible to edit an image on a cell phone and take a screenshot of the result. Further, a similar machine gun and high-capacity magazines to those appearing in the photo were seized from the safe at defendant's parents' home. From this evidence, we can infer that defendant took the photo and composed an advertisement to sell these items, but not that he sent the advertisement as an offer to sell them.

The People disagree and argue the evidence is sufficient because it is a more reasonable inference that defendant sent the edited image to at least one person than "keeping it hidden on his phone." Not so. While the expert testified the results of the cell phone download were incomplete, we cannot infer the existence of an entry that may not exist without some evidence supporting it. No evidence was introduced showing another person received the advertisement from defendant or saw it posted on a social media platform. The fact that some of the weapons appearing in the advertisement were not recovered from the search, does not necessarily mean defendant relinquished these items through sale, thus implying the advertisement was sent. The evidence overwhelmingly suggested defendant kept an arsenal of weapons for ready use by fellow gang members. Indeed, around the time the advertisement appeared on defendant's cell phone, he had two conversations wherein he implied to fellow gang members they could have access to his arsenal. Because no evidence tends to corroborate the People's conclusion defendant sent or posted the advertisement, we believe that conclusion equally

16

true to its counter—that defendant kept the advertisement on his phone. Thus, the finding defendant offered to sell the items in the screenshot on his cell phone was unsupported by the evidence. (See *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416-1417 [" ' " '[a] finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence' " ' "], disapproved on other grounds in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.)

As to the Facebook conversation between defendant and an unknown individual in which defendant indicated he knew where to purchase a machine gun and "hundred round drums," we believe that sufficient to establish he offered to sell a machine gun and a 100-round magazine. During the conversation, defendant showed his extensive knowledge of the machine gun by listing its characteristics and price, indicating his knowledge extended beyond knowing of a potential source for the machine gun. When the unknown individual expressed hesitation at purchasing such an expensive weapon, defendant became a salesman by justifying the price by pointing to the gun's illegal but desirable characteristics and the risk involved in its manufacturing. The evidence also showed defendant possessed a machine gun and large-capacity magazine similar to the one he described in the conversation and that he was a member of a gang whose primary criminal activity was the sale of this assault weapon. Taken together, it was reasonable to infer the "fully auto" weapon and "hundred round drum[]" defendant offered to the unknown individual was the machine gun and the 100-round magazine he possessed or could be sourced from the criminal enterprise in which he participated. Accordingly, sufficient evidence supports defendant's convictions for offering to sell a machine gun (count 1) and the 100-round, large-capacity magazine (count 7).

17

B

*Sufficient Evidence Supports Defendant's Convictions Regarding*

*The Large-Capacity Magazines Compatible With The Handguns*

Former section 32310 provided at the time of defendant's arrest in June 2015 that "any person . . . who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is" guilty of either a misdemeanor or a felony. (Stats. 2013, ch. 728, § 1.) Other than the conviction for the 100-round magazine, we concluded defendant offered to sell, he was also convicted of two other offenses under this section based on the large-capacity magazines found in the safe.

The People argue those convictions are supported by the evidence because the statute prohibits the receiving of a large-capacity magazine, in addition to its sale, and the evidence, at a minimum, established defendant received the large-capacity magazines before putting them in the safe. Defendant counters the evidence was insufficient under this theory because receiving and purchasing large-capacity magazines became illegal in January 2014 (compare Stats. 2013, ch. 728, § 1 with Stats. 2012, ch. 43 § 107), and the prosecution did not establish he received or purchased the large-capacity magazines after the prohibition was enacted. We agree with defendant. The evidence established defendant was a long-time member of the Varrio Bosque gang and often possessed firearms and large-capacity magazines. Given this evidence, it is not clear he received or purchased the large-capacity magazines after 2014 when the statute prohibited such conduct.

The evidence, however, does show defendant kept the two large-capacity magazines for sale. During defendant's Facebook conversation where he offered to sell an automatic assault weapon and its compatible large-capacity magazine, defendant indicated he had access to other illegal weapons to sell. Defendant further manifested an intent to sell these particular large-capacity magazines by composing an advertisement to

18

sell them.  Considered with defendant's participation in the illegal weapons trade, the evidence sufficiently established defendant kept the large-capacity magazines for the purposes of selling them.  Thus, the evidence shows a violation of former section 32310 as it pertains to the large-capacity magazine compatible with the .40-caliber handgun (count 8) and the large-capacity magazine compatible with a nine-millimeter handgun (count 9).

C

*Sufficient Evidence Supports Most Of Defendant's Gang Enhancements Under*

*The Gang Enhancement Statute In Effect At The Time Of Defendant's Trial*

Defendant contends insufficient evidence established he committed all the offenses for the benefit of a criminal street gang.  We agree sufficient evidence did not establish defendant acted for the benefit of a criminal street gang (1) when he possessed methamphetamine for sale or (2) when he possessed a loaded firearm in public and while in possession of drugs.  We disagree as to defendant's other contentions.

1

*Applicable Law*

The "enhancement [formerly] set forth in section 186.22[, subdivision ](b)(1) does not . . . depend on membership in a gang at all.  Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 67-68.)  To prove the crime was "gang related," the prosecution needed to only prove one of three alternatives:  the crime was committed "(1) for the benefit of, (2) at the direction of, or (3) in association with a gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198, italics omitted.)  "Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 561.)

19

The prosecution was permitted to rely on expert testimony regarding criminal street gangs to establish a gang enhancement. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) "A gang expert's testimony alone[, however,] is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657; accord, *People v. Albillar*, *supra*, 51 Cal.4th at p. 63.) "[P]urely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because committing crimes enhances the gang's reputation are insufficient to support a gang allegation. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820.)

Defendant relies on four cases to illustrate this point. First, in *Rios*, a jury found the defendant guilty of carrying a loaded firearm in a vehicle and unlawful taking of a vehicle, finding the gang enhancement allegations attached to those crimes true under the former gang enhancement statute. (*People v. Rios*, *supra*, 222 Cal.App.4th at p. 545.) An officer saw the defendant driving a car, which was later determined to have been stolen, and pulled the vehicle over based on a cracked windshield. (*Id*. at pp. 547-548.) Because the defendant, the vehicle's sole occupant, did not have a driver's license, the officer decided to impound the car. (*Ibid*.) During an inventory search, the officer found gang-related paraphernalia and a loaded, unregistered gun wrapped in a T-shirt under the front passenger seat. (*Id*. at p. 548.) Defendant admitted to gang membership and association during the booking process but denied membership at trial. (*Id*. at p. 549-550, 554.) "[T]here was no evidence that any victim in this case or anyone in the local community knew defendant was a gang member, was affiliated with a gang, or was acting with a gang purpose." (*Id*. at p. 573.) The gang expert in *Rios* testified as to the value and uses of a gun, especially an unregistered gun that "cannot be traced back to the

gang member." (*Id*. at pp. 550, 553.)  It was his opinion that "a gang member with a firearm promotes, furthers and assists felonious conduct by other gang members." (*Id*. at p. 553.)  The appellate court held this testimony and the evidence presented insufficient under the former statute because "in a case such as this, where the defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong of the gang enhancement" because "[o]therwise, the gang enhancement would be used merely to punish gang membership." (*Id*. at pp. 573-574.)

Also pertaining to the specific intent element, defendant points to *Ramon*. (*People v. Ramon* (2009) 175 Cal.App.4th 843.)  In *Ramon*, the defendant, a gang member, was stopped by police in his gang's territory while driving a stolen truck.  A fellow gang member was his passenger, and an unregistered firearm was found under the driver's seat.  (*Id.* at pp. 846-847, 849.)  The prosecution's gang expert testified at trial that the stolen truck and the unregistered firearm could be used to commit gang crimes. (*Id.* at pp. 847-848.)  He offered an opinion that possession of a gun and driving of a stolen truck in gang territory therefore benefited the gang and that the perpetrators of these offenses would intend to promote the gang.  (*Id.* at p. 848.)  The expert testified stolen trucks and firearms were "tools" the gang needed to commit other crimes.  (*Ibid*.) The appellate court concluded this insufficient under the former statute to prove the defendant had the specific intent to promote, further, or assist criminal conduct by gang members because no facts beyond the defendant's gang membership, association, and location informed the expert's opinion as to the crimes charged.  (*Id.* at p. 852.)  "While the People's expert's opinion certainly was one possibility, it was not the only possibility. And, as stated *ante*, a mere possibility is not sufficient to support a verdict." (*Id.* at p. 853.)

*Ochoa*, on the other hand, pertains to the sufficiency of the evidence to support the gang benefit element of the former gang enhancement.  (*People v. Ochoa*, *supra*,

179 Cal.App.4th at p. 652.)  There, the defendant, a gang member, acted alone in committing a carjacking with a shotgun.  (*Id.* at p. 653.)  The offense had not occurred in the defendant's gang's territory.  (*Id.* at p. 662.)  A divided Fourth District found the evidence insufficient under the former statute to sustain the benefit element of the gang enhancements attached to defendant's carjacking and felon in possession of a firearm convictions.  "[N]othing in the circumstances of the instant offenses sustain[s] the expert witness's inference that they were gang related."  (*Id*. at pp. 661-662.)  "[The gang expert's testimony] was based solely on speculation, not evidence.  An appellate court cannot affirm a conviction based on speculation, conjecture, guesswork, or supposition."  (*Id.* at p. 663.)

In *Perez*, we concluded the evidence supporting both prongs was lacking under the former statute.  (*People v. Perez* (2017) 18 Cal.App.5th 598, 610.)  There, the defendant, a "validated and heavily tattooed [Norteño] gang member," shot four students at a college party.  (*Id.* at pp. 601-603.)  There was no evidence, however, he was accompanied by a fellow gang member or the shooting took place in gang territory.  (*Id*. at pp. 601, 609.)  In response to the prosecutor's hypothetical question (*id*. at p. 609), the gang expert testified the shooting benefited the Norteños because " '[the shooting]'s going to instill fear in anybody who knows about that shooting occurring' " and " '[t]hat fear is going to be now attributed to the reputation of the Norteños' " (*id*. at p. 610).  The evidence, though, undermined his opinion:  the defendant did not wear gang clothing, did not yell gang epithets, and did not throw gang signs; the defendant's tattoos were not visible; and the partygoers did not know about the defendant's gang affiliation.  (*Id*. at pp. 609, 613-614.)

*Sufficient Evidence Supports The Gang Enhancements Under*
*The Former Statute, Except For Those Attached To The*
*Convictions Concerning Items Seized From Defendant's Car*

Defendant argues his case is similar to the above examples because no evidence linked his conduct with his gang, except the expert's speculation and assumptions. Starting with defendant's offer to sell the machine gun and its compatible large-capacity magazine, defendant argues the evidence is insufficient under the former statute to show the offenses were gang related or that his specific intent was to assist any specific criminal conduct. Not so.

In addition to defendant's offer to sell and his gang membership, the evidence corroborated the gang expert's testimony gun sales were a primary criminal activity of the Varrio Bosque and defendant's engagement in that activity was gang related. At the time of defendant's arrest, three other Varrio Bosque members were arrested for offering to sell short-barrel machine guns similar to the one defendant owned. One of them was Javier Moreno, a person featured in multiple videos on defendant's cell phone proclaiming his loyalty to defendant's gang.

Further, defendant possessed the same type of weapon those members possessed and offered to sell the weapon nine months before his fellow gang members were arrested for similar conduct. This leads to the reasonable inference defendant and his fellow gang members sourced multiple weapons to sell as a gang. Indeed, a photo from defendant's cell phone confirms this inference. The photo of three short-barrel assault weapons (similar in appearance to the machine gun seized from the safe) next to gang paraphernalia (the "City of Trees" placard) suggested defendant had access to multiple machine guns through his gang membership. Thus, evidence beyond defendant's gang membership and the crime itself established the offer to sell was associated with the Varrio Bosque's criminal activity of illegally selling machine guns and that defendant

intended his conduct to assist in that criminal venture. Because the evidence links defendant's offer to sell the machine gun and compatible large-capacity magazine to the Varrio Bosque in this way, we need not address whether the evidence established the Varrio Bosque's reputation for violence was benefited through this conduct as well.

Unlike the offer to sell the machine gun and its compatible magazine, the evidence did not corroborate the gang expert's testimony the Varrio Bosque also sold drugs as a primary criminal activity. No evidence established other members were engaged in drug sales, nor did the videos or photos from defendant's cell phone link defendant's drug sales to his gang. True, his possession of drugs was heavily linked to his possession of guns, but these videos do not show defendant flashing gang signs or calling out gang names. The only evidence indicating defendant's drug sales were gang related was a single communication where an unidentified individual asks defendant for drugs while referring to him by a commonly used gang term. This evidence reasonably established that one of defendant's clients was a gang member, but not that defendant sold drugs as part of the larger Varrio Bosque criminal network and benefited the gang through his conduct. Because no evidence corroborated the expert's opinion defendant's sale of methamphetamine was gang related, let alone that he sold drugs with the specific intent to benefit the Varrio Bosque, insufficient evidence supports the gang enhancement under the former statute attached to that conviction.

The evidence is also insufficient to support the enhancements under the former statute attached to defendant's convictions for possessing a loaded firearm in public and while possessing methamphetamine. These convictions, as well as the possession of methamphetamine with intent to sell, were based on the search of defendant's car after he arrived at work. While the expert testified gun possession benefits a gang's reputation for violence and strikes fear in the community, we share the concerns of the cases cited by defendant in that there is no evidence specific to defendant showing his possession of this loaded firearm in public and while in possession of methamphetamine benefited his

24

gang. (See *People v. Perez*, *supra*, 18 Cal.App.5th at pp. 613-614; *People v. Rios*, *supra*, 222 Cal.App.4th at pp. 573-574; *People v. Ramon*, *supra*, 175 Cal.App.4th at pp. 852-853; *People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 663.) No evidence showed defendant shared his gang affiliation in the workplace, let alone that anybody actually knew of his membership or possession of guns and methamphetamine. Thus, no evidence corroborates the expert's testimony the Varrio Bosque's reputation was enhanced by defendant's possession of a loaded firearm at the time of his arrest. Further, we have already concluded the evidence was insufficient to establish defendant's possession of methamphetamine for purposes of sale was gang related, thus we cannot conclude his possession of a loaded firearm would benefit the gang by protecting the product sold as its criminal activity. Accordingly, insufficient evidence supports the gang enhancements under the former statute attached to defendant's convictions for possessing a loaded firearm in public and while in possession of methamphetamine.

Outside of the primary criminal activities of the Varrio Bosque, the gang expert testified it was common among gang members to share weapons for use in criminal activities. Usually, the member with the shortest criminal record or risk of being caught would store the guns for shared use. Ample evidence established this was true for defendant. Defendant's father testified defendant stored defendant's weapons at his (defendant's father's) home because defendant was not allowed to own them. Despite not keeping the weapons in his home, defendant had unfettered access to them, which the evidence established he then offered to his fellow gang members. When promoting his gang's reputation for violence on social media, defendant indicated the handguns in the safe, along with their compatible large-capacity magazines, were available to his "brothers" to wage war. During a text message conversation with multiple gang members, defendant offered other weapons for use while planning a potential assault to

25

solve an internal gang conflict.[7]  Similarly, during a text conversation, defendant listed his weapons when a fellow Varrio Bosque member inquired what "toys" he owned, as if taking inventory of available firearms.  Further, photos on defendant's cell phone show he allowed his fellow gang members to possess the weapons at least for photos.  Taken together, the evidence established defendant was willing to share possession of his guns with his fellow Varrio Bosque members for the purpose of committing criminal activities, like the assault to resolve a gang conflict or for purposes of intimidating the community as shown in defendant's Facebook posts and various photos on his cell phone.  Thus, evidence beyond defendant's gang membership and the expert's testimony linked his possession of the firearms in the safe and his car to the Varrio Bosque.  Accordingly, sufficient evidence supports the gang enhancements under the former statute attached to those convictions.

D

*Insufficient Evidence Supports Defendant's Remaining*

*Gang Enhancements Under The Current Gang Enhancement Statute*

The parties agree insufficient evidence supports defendant's still remaining gang enhancements under the current version of the law.  We agree.

Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 4) amended section 186.22 in several fundamental ways.  As relevant here, the definition of a criminal street gang requires a showing the alleged gang engages in a pattern of

---

[7]      Defendant argues this conversation should not stand for the proposition he was willing to loan his guns to fellow gang members because no evidence confirms his offer was genuine given nothing came of the conversation.  He contends his excuse he could not participate in an assault because he was watching his children could have been cover for his true intent to not get involved.  Defendant's interpretation is but one interpretation.  Another, and more reasonable interpretation, is exactly what defendant said—he wanted to bring his weapons to assist his gang in the assault but could not because he was watching his children.

26

criminal gang activity. (§ 186.22, subd. (f).) Assembly Bill No. 333 "redefines 'pattern of criminal gang activity' to require that the last of the [two or more] predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' " (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345; see § 186.22, subd. (e)(1).) Additionally, the currently charged offense cannot be used as a predicate offense under the amendments made by Assembly Bill No. 333. (*Lopez*, at p. 345.)

We agree with the parties that Assembly Bill No. 333's changes are retroactive. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206-1207.) We also agree with the parties that defendant's gang enhancements must be vacated in light of Assembly Bill No. 333. As noted, defendant stipulated that Varrio Bosque was a criminal street gang under the prior version of the gang statute. This stipulation did not include a stipulation to facts sufficient to establish the additional elements noted above and required by the current version of section 186.22, subdivisions (e)(1) and (f). Defendant "has a constitutional right to a jury trial on every element of the charged enhancement." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.) Because there is no proof of numerous current elements of section 186.22, subdivisions (e)(1) and (f), the remaining gang enhancements must be vacated. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 668.)

On remand, the prosecution is afforded the opportunity to retry defendant under current law. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346; see also *People v. Eagle*, *supra*, 246 Cal.App.4th at p. 280 ["When a statutory amendment adds . . . additional element[s] to an offense, the prosecution must be afforded the opportunity to establish the additional element[s] upon remand. [Citation.] Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the [additional elements

27

were] not relevant to the charges at the time of trial and accordingly, [the issue] was never tried."].)

## DISPOSITION

The gang enhancements attached to defendant's conviction for possessing methamphetamine for sale (count 2) and possessing a loaded firearm while in possession of methamphetamine (count 10) and while in public (count 11) are stricken and cannot be retried. The remaining gang enhancements are vacated and can be retried on remand if the prosecution so elects. The judgment is otherwise affirmed.


          /s/
          Robie, Acting P. J.


We concur:


 /s/
Krause, J.


 /s/
Boulware Eurie, J.